WEST *v.* UNITED STATES ET AL.

No. 11.   Argued November 12, 1959.—Decided December 7, 1959.

*Abraham E. Freedman* argued the cause for petitioner. With him on the brief was *Joseph Weiner.*

*Leavenworth Colby* argued the cause for respondents. With him on a brief for the United States were *Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade* and *Herbert E. Morris.*

*Thomson F. Edwards* and *J. B. H. Carter* were on a brief for Atlantic Port Contractors, Inc., Respondent-Impleaded.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a libel filed pursuant to the Public Vessels Act, 46 U. S. C. § 781 *et seq.,* and involving the liability of a shipowner for injuries suffered by an employee of an

independent contractor while working inside the main engine of a vessel as it was undergoing a complete overhaul at the contractor's repair docks in Philadelphia. Petitioner claims the vessel was unseaworthy and that respondent was negligent, in any event, in not furnishing him a safe place to work. The District Court denied recovery, 143 F. Supp. 473, and the Court of Appeals affirmed, 256 F. 2d 671. We granted certiorari. 359 U. S. 924. We affirm the judgment.[1]

The findings of the trial judge, approved by the Court of Appeals, show that the S. S. *Mary Austin* is owned by the United States and was built during World War II as a "Liberty" ship. It had been in the "moth-ball fleet" at Norfolk, Virginia, in total deactivation for several years, with its pipes, boilers, and tanks completely drained, and an oil preservative injected through them to prevent rusting. In 1951 the vessel was ordered reactivated and a contractor, Atlantic Port Contractors, Inc., was selected to prepare her for sea duty. Under the specifications of the contract, Atlantic was to overhaul and eactivate the *Mary Austin* completely, "cleaning and repairing all water lines, replacement of all defective or missing plugs and other parts, and the testing of all lines before closing and placing them in active operating condition." The contractor was to have complete responsibility and control of the making of the repairs, with the right in the United States to inspect the work and materials to insure compliance with the contract. For this purpose, the United States placed six of its men—a captain, chief mate, second mate, chief engineer, assistant engineer, and steward—on board the vessel. However, they signed no shipping articles and had no "control of the ship in the ordinarily accepted context," their sole function being to

---

[1] This obviates the necessity of deciding the respondent's claim over and against the contractor.

serve as inspectors for the United States. Thereafter the respondent towed the *Mary Austin* to the repair docks of the contractor at Philadelphia and turned her over to it for the performance of the repair contract.

The petitioner, a shore-based employee of the contractor, was working inside the low pressure cylinder of the main engine of the ship when he was injured. He was kneeling on his right knee when an end plug from a one-inch pipe in the water system was propelled through the top of the open cylinder and hit his left knee. The findings indicate that the plug was loosely fitted on an overhead water pipe and that, when another employee of the contractor turned on the water without warning, the plug was forced off, hitting petitioner.

Recovery was sought on the theory that the vessel was unseaworthy in that the plug had been fitted insecurely on the pipe and was therefore incapable of withstanding the water pressure exerted upon it. In addition, petitioner claimed that the United States was liable for negligence in not maintaining a safe place for him to work, a duty asserted to be nondelegable and absolute.

## I.

Petitioner contends that he comes under the doctrine of *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946), and subsequent cases, holding that the warranty of seaworthiness applies to shore-based workers while on board ship and performing work traditionally done by seamen. We do not think so. In *Sieracki,* the Court said that the warranty applied because such a shore worker "is, in short, a seaman . . . doing a seaman's work and incurring a seaman's hazards." *Id.,* 99. The findings here, however, show that, for several years, the *Mary Austin* was withdrawn from any operation whatever while in storage with the "moth-ball fleet." The water had been drained from her water system and an antirust preservative was injected

therein. Her subsequent towing to Philadelphia was for the specific purpose of delivery to Atlantic to render her seaworthy. The representation of the repair contract specifications was that she was not seaworthy for a voyage and that the major repairs called for therein would be necessary before one would be undertaken. It is evident that the sole purpose of the ship's being at Atlantic's repair dock at Philadelphia was to make her seaworthy. The totality of the reparation on the vessel included compliance with the hundreds of specifications in the contract calling for the repairing, reconditioning, and replacement, where necessary, of equipment so as to make fit all the machinery, equipment, gear, and every part of the vessel. Strangely enough, the defective water line and the metal plug specifically pointed to by petitioner as being defective were listed in the specifications for "cleaning and repairing" and the "replacement of all defective or missing plugs." In short, as the trial court said, the work to be done on the vessel was equivalent to "home port structural repairs."

On the other hand, the vessels involved in the cases depended upon by petitioner [2] were, at the times of the injuries, in the hands and under the control of the owners or charterers and, instead of undergoing general repairs, were in active maritime service in the course of loading or unloading cargo pursuant to voyages. The workmen, like the seamen, depended upon the seaworthiness of the ships, their equipment, and gear. They were obliged to work with whatever the shipowners supplied and it was only fair for the latter to be subjected to the absolute warranty that the ships were seaworthy. But no such situa-

[2] *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52 (1914) ; *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50 (1926) ; *Pope & Talbot* v. *Hawn*, 346 U. S. 406 (1953) ; *Alaska Steamship Co.* v. *Petterson*, 347 U. S. 396 (1954) ; *Crumady* v. *The Joachim Hendrik Fisser*, 358 U. S. 423 (1959).

tion is present here. The *Mary Austin,* as anyone could see, was not in maritime service. She was undergoing major repairs and complete renovation, as the petitioner knew. Furthermore, he took his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not "ship's work" but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury. The job analysis which the latter would call for would lead to fortuitous results. We, therefore, do not believe that the *Sieracki* line of cases is applicable, which obviates any necessity of our discussion of situations where the vessels themselves are not in the status of the *Mary Austin.* Here there could be no express or implied warranty of seaworthiness to any person.

## II.

In presenting his alternative ground of recovery, the petitioner has a dual theory. He first says that the duty to furnish a safe place to work is a nondelegable duty, the violation of which does not depend on fault. If unsuccessful in this position, he insists that respondent's failure to keep the water plug tight was negligence.[3]

Other than the doctrine of seaworthiness, whose nonrelevancy to this case we have set forth, our decisions

---

[3] There is no claim of negligence in the selection of Atlantic to perform the overhaul on the *Mary Austin.*

establish no basis of liability apart from fault. Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. But we do not believe that such a duty was owed under the circumstances of this case. Petitioner overlooks that here the respondent had no control over the vessel, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both aspects of plaintiff's dual theory. There was no hidden defect in the water system. It was one of the objects to be repaired and its plugs were to be replaced where necessary. Its testing was to be done by the contractor—not by the shipowner. It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The respondent, having hired Atlantic to perform the overhaul and reconditioning of the vessel—including the testing—was under no duty to protect petitioner from risks that were inherent in the carrying out of the contract. The Courts of Appeals seem to have followed this rule. See *Filipek* v. *Moore-McCormack Lines,* 258 F. 2d 734. Although some of respondent's employees were on board the ship here, this would not attach liability since they gave no orders, and did not participate in the work or supervise its progress, but were simply inspectors or observers. *Id.,* at 737.

Petitioner cites *Crumady* v. *The Joachim Hendrik Fisser,* 358 U. S. 423 (1959), as the chief support for his contention. There the vessel was being unloaded of cargo and its employees had set the safety cutoff device on its winch at twice the tonnage limit of the rigging. When the stevedore, unaware of this situation, brought the winch into play, the rigging snapped and the injury resulted.

We found that the safety cutoff had been adjusted by employees of the vessel in a way that made it unsafe and dangerous, and therefore the vessel was liable. But that situation is not comparable. There the vessel was in control of the owner, and he was liable under the absolute warranty of seaworthiness, as well as for the negligence of the ship's employees in setting the ship's safety cutoff device. Any culpability here could be chargeable only to the contractor, not to the shipowner. Nor was *United Pilots Assn.* v. *Halecki,* 358 U. S. 613 (1959), a similar situation. In that case the shipowner directed the use of carbon tetrachloride in the confined spaces of the engine room. The resulting fumes fatally injured the shore-based workman, necessitating a remand on the negligence question. But here the owner had no control of the ship; it had been turned over to a repair contractor for extensive overhaul, which was not performed under the direction of the shipowner. While there might be instances of hidden or inherent defects, sometimes called "latent," that would make the owner guilty of negligence, even though he had no control of the repairs, we hold that under the circumstances here the shipowner could not be so chargeable. The judgment is therefore

*Affirmed.*