Benjamin J. MOON, Libelant,

v.

UNITED STATES of America, Respondent.

UNITED STATES of America, Petitioner-Respondent,

v.

IRA S. BUSHEY & SONS, INC., Respondent-Impleaded.

IRA S. BUSHEY & SONS, INC., Petitioner-Respondent-Impleaded,

v.

TOLLEFSEN BROS., INC. and George Tollefsen and Margaret A. Tollefsen, co-partners, doing business under the name and style of Tollefsen Bros., Respondent-Impleaded.

No. 20418.

United States District Court
E. D. New York.
July 20, 1960.

Aaron J. Broder, New York City, for libelant, Leonard L. Steinman, New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., for U. S., Benjamin H. Berman and Walter L. Hopkins, Admiralty & Shipping Section, Dept. of Justice, New York City, of counsel.

Charles G. Tierney, New York City, Raymond C. Green, New York City, of counsel, and Lawless & Lynch, New York City, for respondent-impleaded, Ira S. Bushey & Sons, Inc., Howard Davis, of counsel.

Victor J. Herwitz, New York City, for respondent-impleaded, Tollefsen Brothers, Benjamin R. Kaplan, New York City, of counsel.

ABRUZZO, District Judge.

Libelant instituted this suit against the respondent, United States of America, as owner of the Floating Drydock ARD–7 to recover damages for personal injuries sustained on January 15, 1954, while employed as a welder aboard the vessel by respondent-impleaded Ira S. Bushey & Sons, Inc., hereinafter referred to as Bushey, due to the unseaworthiness of the vessel and failure of respondent to provide him with a safe place within which to work.

Respondent United States of America impleaded Bushey claiming indemnity over in the event of a recovery by libelant based upon both an express indemnity agreement and an implied obligation of indemnity. Bushey in turn impleaded Tollefsen Bros., Inc., and George Tollefsen and Margaret A. Tollefsen, doing business as Tollefsen Bros., hereinafter referred to as Tollefsen, to whom Bushey had subcontracted blasting and painting operations on the vessel. Bushey claimed that, if there was any negligence which caused the libelant's accident and for which negligence the libelant is entitled to recovery, it was the sole negligence of Tollefsen.

The ARD–7 was a floating drydock in service with the United States Navy which had been at Bushey's repair yard from early November, 1953, until the date of the accident, undergoing extensive modifications, alterations and repairs under contract between the Government and Bushey (Lib. Ex. 1). The total cost of the job was over $300,000, and entailed, among other things, the modification and alteration of the tail-gate (Gov. Ex. G). The vessel remained at the repair yard of Bushey until January 29, 1954 (Gov. Ex. F) and, at the time of the accident, due to the fact that the tail-gate was still under repair, could not carry out her functions as a floating drydock.

Libelant testified that he started work aboard the ARD–7 about a week prior to the accident, working on the nightshift from 5 p. m. to 1:30 p. m. The vessel was moored to a pier at Bushey's drydock and on the pier was a sandblast hopper which is a funnel-shaped contraption into which sandblast material is put in it and then shot from a hose. Libelant was assigned to weld a ½ inch or ⅝ inch steel insert plate measuring 4 feet by 4 feet to the bulkhead on the port side of the vessel just beyond midship toward the stern at the very bottom of the drydock. On the night before the accident he finished welding the plate on the dock side. Just prior to the accident he stood between the catwalk and the wing wall

and had welded one inch of the left side of the plate to the bulkhead on an upbeat from the bottom of the plate. He disposed of the stub of the welding wire, turned to his right to reach for a new welding wire in back of him and his foot slipped on some damp sandblast shot or grit, and he fell into an open hole about 5 feet by 5 feet and more than 10 feet deep against a beam straddling the hole.

Libelant testified there was a single light on a pole behind him aft on the other side of the catwalk which illuminated the panel or insert on which he was working and, although there was sufficient light to illuminate the insert, it failed to illuminate the beam or hole into which he fell. He did not see the sandblast, hole, beam or grit before the accident. He later pulled or "wormed" himself onto the deck and there was sandblast grit on his face, welding gloves and clothing.

Libelant never told anyone connected with his employer Bushey about the sandblast material. He did not recall telling his "snapper" whom he identified as "Hawkins" about the sandblast material and did not tell the physician to whom he was taken after the accident about the sandblast material. Furthermore, the first notice given to Tollefsen about his accident was when an action was commenced in the New York State Supreme Court about 3 years after the accident occurred. The summons and complaint in said action are dated December 21, 1956.

Haaken Englesen, Bushey's assistant foreman on the nightshift, testified that he is known as "Hawkins." He stated that there were 2 drop lights illuminating the area in which libelant was working, one of which had a 300-watt bulb and was wire-enclosed; the other a 500-watt solidly enclosed by metal. Both lights were lit when he made his inspection. He also testified that the area in which libelant was working was clean and he saw no sandblast grit on Moon's clothing or body.

George Tollefsen testified that no sandblasting work had been performed aboard the ARD-7 after January 2, 1954, and that the deck had been painted promptly after sandblasting in conformity with Navy requirements that bare metal be painted within one week after sandblasting.

■ The Court places no credence in the testimony of the libelant and finds that there was light in the area in which the libelant was working, sufficient to enable him to see the hole in which he claims he fell. The Court also finds that there was no sandblasting material aboard the vessel at the time of the accident.

Based upon this testimony the Court cannot find that the libelant has sustained the burden of proof cast upon him of proving by a fair preponderance of the evidence that there was not sufficient light in the area in which he was working, nor that there was any sandblast material at the place where the libelant was working, upon which a finding of negligence could be predicated.

Besides the question of credibility, this suit presents another aspect which defeats libelant's claim. The witness Burns, a warrant officer in the United States Navy and a ship's repair technician, testified that he had been assigned to the ARD-7 in August, 1953. In the first week of November, 1953, the vessel went into Bushey's yard and he was stationed aboard the vessel during all the time the vessel was undergoing repairs. There were crew quarters aboard the vessel which had a complement of three officers and 31 men but after 4 p. m. only a skeleton crew of 6 men of various rates had to remain aboard. The only duties of the officers and crew during the time that the ship was at Bushey's was that of housecleaning. They did no work aboard her, nor did they supervise the work. They were merely responsible for the safety and cleanliness of the vessel. Rounds were made by the crew at night but not during the day. This crew remained on board the ship for security reasons. It was the crew's duty to see that fires did not break out on board the vessel and that no material was stolen. Burns testified unequivocally that the

crew had no control over the work and did not have any authority over Bushey's men. Bushey was working on this dry-dock pursuant to a contract (Lib. Ex. 1) and specifications attached thereto.

The witness Ziegler testified that he was a civilian Navy inspector, one of the three assigned to the ARD–7 while she was at Bushey's undergoing repairs. The job of the inspectors was merely to inspect the details of each job upon completion and see that they conformed with specifications. No inspector had the duty or authority to supervise the manner in which a particular job was being done except where the safety of the vessel was concerned, or the job was being done in such fashion that it could not be completed properly or on time. He had no duty with respect to the safety of Bushey's repair workers. He also testified that a grating which normally covered the hole had been removed during the work but not by any Government employee. He testified that all light and power aboard the vessel came from outside the vessel and were supplied by Bushey.

The doctrine of liability of a shipowner who has turned his vessel over to a contractor for overhaul or repairs has been determined by the Supreme Court in the recent case of West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L. Ed.2d 161. The Court of Appeals for the Second Circuit in the case of Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599, briefly summarized some of the facts and the law of the West case. It said (275 F. 2d at page 603):

"The most recent decision by the Supreme Court on this subject is West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 192, 4 L.Ed.2d 161. There the Mary Austin was removed from the 'moth ball fleet' at Norfolk, Virginia, and turned over to a contractor for 'a complete overhaul,' so that she could be reactivated and put in condition for sea duty. It was held that an employee of the contractor could not recover for unseaworthiness as there was no duty

on the part of the shipowner to maintain the vessel in a seaworthy condition. Six of the shipowner's men, a captain, chief mate, second mate, chief engineer, assistant engineer and steward were on board, but solely for the purpose of inspecting the progress of the work. The control of the entire vessel was at all times relevant to the issues in the case in the contractor. [sic] She was about as unseaworthy as a vessel can be and still remain afloat and she was turned over to the contractor 'for the sole purpose of making her seaworthy.'

"As said by Mr. Justice Clark:

" 'It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen are doing on shipboard at the moment of injury.' "

and (at page 604):

"West, however, makes it clear that, at least in some cases, control of the vessel is a decisive factor, for there it was said:

" 'Petitioner overlooks that here the respondent had no control over the vessel or power either to supervise or to control the repair work on which petitioner was engaged. We believe this decisive against both aspects of plaintiff's dual theory' (negligence and unseaworthiness)."

The facts in the West case are to a very large extent similar to the instant suit. The opinion in West sets forth other facts as follows (361 U.S. at pages 121, 122, 123, 80 S.Ct. at pages 192):

"It is evident that the sole purpose of the ship's being at Atlantic's repair dock at Philadelphia was to make her seaworthy.

\* \* \* \* \* \*

"The Mary Austin, as anyone could see, was not in maritime service. She was undergoing major re-

pairs and complete renovation, as the petitioner knew. Furthermore, he took his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not "ship's work" but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case.

\* \* \* \* \* \*

"Other than the doctrine of seaworthiness, whose nonrelevancy to this case we have set forth, our decisions establish no basis of liability apart from fault. Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. \* \* \* Petitioner overlooks that here the respondent had no control over the vessels, or power either to supervise or to control the repair work in which petitioner was engaged.

\* \* \* \* \* \*

"Although some of respondent's employees were on board the ship here, this would not attach liability since they gave no orders, and did not participate in the work or supervise its progress, but were simply inspectors or observers."

The only difference between West and the instant suit is that in West the ship had been in the "Moth Ball Fleet" completely deactivated for several years. In the instant case the ARD–7 had not been in a "Moth Ball Fleet" but had been in drydock for several months and as in West was totally deactivated.

In the suit at bar the respondent had completely turned over the vessel to Bushey. The control of the vessel lay entirely with Bushey. Applying the principles laid down in the West and Lawlor cases, supra, the United States of America is entitled to a decree on the theory that having parted with complete control of the vessel it is not responsible for any injuries sustained by the libelant.

The libel against the United States of America therefore must be dismissed. In view of the dismissal of the libel, the questions of respondent's liability over as against Bushey and Bushey's liability over as against Tollefsen has become moot and the respective petitions to implead must also be dismissed.

Submit findings of fact and conclusions of law together with a decree not later than July 27, 1960.