Roy SPEESE, Appellant,

v.

UNITED STATES of America.

No. 18851.

United States Court of Appeals, Third Circuit.

Argued Oct. 30, 1970.

Decided Feb. 24, 1971.

As Amended on Denial of Rehearing April 2, 1971.

---

1. See N.L.R.B. v. Amalgamated Clothing Workers of America, 5 Cir. 1970, 430 F.2d 966.

Morris M. Shuster, Philadelphia, Pa., for appellant.

Thomas E. Byrne, Jr., Krusen, Evans & Byrne, Philadelphia, Pa., for appellee.

Before FORMAN, SEITZ and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This appeal was taken by Roy Speese from a judgment of February 16, 1970 of the United States District Court for the District of New Jersey in favor of defendant, United States of America and against plaintiff, Mr. Speese. The suit, brought under 46 U.S.C. § 741 et seq., was instituted for injuries sustained by appellant, a maritime worker employed by the New York Shipbuilding Corporation of Camden, New Jersey, when a lifeboat in which he was to paint the gear of its release mechanism, fell 35 to 50 feet into the Delaware River on November 5, 1965. Appellant asserted claims for both negligence and unseaworthiness in the District Court, but is here only to test the propriety of the judgment of the District Court based on his claim of negligence.

The accident of which appellant complained occurred aboard the S.S. Exhibitor, owned by the United States. It had been built in 1940, was decommissioned at the end of 1962, and stored in the "mothball" fleet until October 2, 1965, when the Government determined to reactivate it. Accordingly, a contract was awarded to the New York Shipbuilding Corporation for the overhaul of the ship, covering approximately 499 specific items, at a cost of $440,000. Several of those items pertained to the S.S. Exhibitor's lifeboats, and were for their removal from her hold where they were stowed, and for reconditioning and restoration to their launching rigs. On November 5, 1965, appellant was directed by his foreman to enter the port lifeboat and paint the gear of its release mechanism red, with a six-inch outline border of white. Appellant thereupon climbed into the lifeboat with his pots of paint and brushes. He stepped into the place in which he was to work and was about to bend down to brush some shavings out of the way when the accident occurred. Although appellant remembered nothing of the accident thereafter, the District Judge found that he disconnected the lifeboat from its lowering lines by activating the release mechanism. The lifeboat plummeted some 35 to 50 feet below, from which appellant suffered serious injuries. Under 29 C.F.R. § 1501.56, shipyard employees may not work in a lifeboat unless it is secured independently of the releasing gear by safety wires, but these wires had been removed prior to the accident in preparation for a weight test on the lifeboat.

The case was tried to the District Judge without a jury, and in his Findings of Fact and Conclusions of Law he held that the Government was not guilty of negligence *per se*, since it had not violated Coast Guard Regulation 97.37–37(e)[1] and was not in control of the repair operations. It was further found that the Government was not guilty of ordinary negligence, since it was not in control, did not breach any duty of care with respect to appellant and neither its action nor its inaction was the proximate cause of appellant's injuries. On

---

1. 46 C.F.R. § 97.37–37 (1970) (Lifeboats)
   "(e) Where mechanical disengaging apparatus is used, the control effecting the release of the lifeboat shall be painted bright red and shall have thereon in raised letters either the words— 'DANGER—LEVER DROPS BOAT,' or the words—'DANGER—LEVER RELEASES HOOKS.' "

the contrary, the District Judge held that either appellant's own negligence, or that of the independent contractor, New York Shipbuilding, or the combination of the two, were the proximate cause of the injuries.[2]

The scope of this court's power of review was expressed in McAllister v. United States:[3]

"In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure."

A threshold contention raised by appellant is that this general rule is inapplicable where "(t)he ultimate findings of fact were predicated upon inferences drawn from evidence as to which there was no disagreement," Soles v. Franzblau.[4] Both Soles and Surgical Supply Service, Inc. v. Adler,[5] cited for the same proposition, are inapposite here. In Soles, a wrongful death action, plaintiffs contended that the structure of an apartment building did not satisfy state statutory requirements providing for access to independent stairwells in case of fire emergencies. The "undisputed" evidence consisted simply of proof that no independent stairwells existed. Surgical Supply involved a challenge to a trial court's decision that the appellant was guilty of unfair competition, and the evidence was comprised solely of two pamphlets distributed by the competing business enterprises, and the uncontradicted testimony of one witness. Clearly, the present case, in which

the conflicting testimony of witnesses and experts for both appellant and appellee, as well as contract provisions and Coast Guard regulations requiring interpretation, were introduced, does not fall within the exception to the "clearly erroneous" test enunciated in Soles and Surgical Supply. Hence, the rule of McAllister is appropriate to this case, and the findings of fact of the District Judge may not be overruled unless clearly erroneous.

I

Appellant contends that the District Judge erred in not finding the Government guilty of negligence per se, arguing that, contrary to the court's finding, the Government had violated Coast Guard Regulation 97.37–37(e).[6] Appellant urges that the warning legend DANGER—LEVER DROPS BOAT, rather than the warning DANGER—LEVER RELEASES HOOKS, should have appeared in the lifeboat in which appellant's accident occurred. Appellant argues further that to comply with the requirements of the regulation that the warning be placed on "the control effecting the release of the lifeboat," it should have been positioned on the release lever itself and not, as in the lifeboat in question, on the surrounding control mechanism. An examination of the pertinent Coast Guard regulations and the reasoning of the District Judge, however, demonstrates that his decision was entirely consistent with statutory requirements.

As the District Judge found, 97.37–37(e) specifically permits either warning legend—DANGER—LEVER DROPS BOAT, or DANGER—LEVER RELEASES HOOKS—to be placed in lifeboats.

---

2. Civ. No. 34–67 (D.N.J., Feb. 16, 1970)
 "The plaintiff courted his own injuries when he activated the release gear. He cannot, upon any principle of law, predicate his damages upon the defendant's mere ownership of the vessel. Defendant's agents did not control the vessel but exercised only the right of inspection. Such inspection was made in a reasonable and prudent manner and did not insure against the negligence of

 the shipyard, its employees, or the plaintiff himself."

3. 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).

4. 352 F.2d 47, 50 (3 Cir. 1965), cert. den. 383 U.S. 911, 86 S.Ct. 897, 15 L.Ed.2d 666 (1966).

5. 321 F.2d 536 (3 Cir. 1963).

6. See note 1, supra.

Appellant's argument that Coast Guard revisions of 97.37–37(e) retained the earlier warning DANGER—LEVER RELEASES HOOKS only for the convenience of vessel owners whose ships were in navigation, and that this legend should have been changed to DANGER—LEVER DROPS BOAT while the S.S. Exhibitor was undergoing repairs, is without merit. Equally so is appellant's argument that the warning in question materially violated the regulations because it lacked the required dash between the words DANGER and LEVER and could therefore be construed as referring to a separate piece of equipment called a "DANGER LEVER." This contention is so farfetched that it does not deserve serious recognition.

Neither can this court accept appellant's contention that the location of the warning deviated from Coast Guard requirements. Coast Guard Regulations 97.37–90(a) and (a) (1)[7] specify that in the case of vessels contracted for pri-

or to November 19, 1952, existing signs and markings which do not comply with subsequent changes in the regulations may be retained if they are similar in intent to new regulations, and are found to be in good condition by the officer in charge of Marine Inspection. The S.S. Exhibitor, built in 1940, falls squarely within the words of his "grandfather" clause. In addition, the markings on the S.S. Exhibitor had been inspected and approved by Marine Inspection officers.

Appellant's assertion that the "grandfather" clause does not apply here because the repair contract was entered into in 1965 is also unsupportable.[8] The District Judge, presented with Coast Guard regulations and conflicting expert testimony,[9] determined that the officer in charge of Marine Inspection possessed wide discretion to approve the markings on boats falling within the scope of the "grandfather" clause, 97.-

7. 46 C.F.R. § 97.37–90 (1970) (Vessels contracted for prior to November 19, 1952.)

"(a) Vessels contracted for prior to November 19, 1952, shall meet the requirements of this paragraph.

"(1) The requirements of §§ 97.37–5 through 97.37–50 shall be met with the exception that existing signs and markings containing the same general intent, but not necessarily identical wording or exact letter type, size, or color, may be retained so long as they are in good condition to the satisfaction of the Officer in Charge, Marine Inspection."

8. Appellant cites Coast Guard Regulation 90.05–5(a) for the proposition that where a repair contract for a vessel has been entered into after November 19, 1952, the vessel does not fall within the "grandfather" clause, §§ 97.37–90(a) and (a) (1). 46 C.F.R. § 90.05–5(a) (1970) provides that:

§ 90.05–5(a):

"* * * As used in this subchapter, the term 'vessels contracted for' includes not only the contracting for the construction of a vessel, but also the contracting for a material alteration to a vessel, the contracting for the conversion of a vessel to a cargo or miscel-

laneous vessel, and the changing of service or route of a vessel if such change increases or modifies the general requirements for the vessel or increases the hazards to which it might be subjected." Contrary to appellant's assertion, the more reasonable interpretation of this section is simply that the "grandfather" clause applies both to contracts for the construction or repair of vessels entered into prior to November 19, 1952.

In the case of the S.S. Exhibitor, where the "construction" of the vessel was contracted for prior to November 19, 1952 but its "material alteration" was effected after that date, it appears beyond doubt that the Marine Inspection officer may in his discretion determine the propriety of the safety warnings and they may remain in effect "so long as" he finds that they contain the same general intent as the post-1952 warnings and are in good condition, in accordance with § 97.37–90 (a) (1).

9. Appellant's expert, John Harkrader, testified that the warning should appear on the shaft of the release lever itself, while appellee's expert, John Hihn, testified that Marine inspectors possessed discretion in specific cases to approve warnings located on the control of the release lever.

37–90(a) and (a) (1),[10] and that such discretion had not been abused in approving the danger warnings which appeared on the S.S. Exhibitor's lifeboats. From an examination of the pertinent Coast Guard regulations, the District Judge's reasoning, and photographs illustrating the position of the warning on the lifeboat under consideration, it is clear that the findings and conclusions of the District Judge on this issue were entirely appropriate. Thus, appellant's contention that the Coast Guard Regulation 97.37–37(e) was violated by the Government is not sustained.

## II

Appellant argues that even if the Government was not guilty of negligence *per se*, it was guilty of ordinary negligence, contrary to the finding of the District Judge. In support of this allegation, appellant contends that the Government retained control over safety precautions while the repair work was in progress, and was under a nondelegable duty to provide a safe place to work for appellant. Appellant argues further that the Government violated its duty of care since it had knowledge of the dangerous condition and permitted it to continue, knowing that persons untrained in the mechanics of lifeboats could sustain, and had sustained, serious injury in the past.

■ The duty of care owed by the Government to appellant depended upon the degree of control over the S.S. Exhibitor retained by it during the repair operation, and not on its mere ownership of the vessel. In West v. United States,[11] on a similar argument by an employee of an independent contractor who had sustained injuries while engaged in repair work on a ship, the Court stated that:

"It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe."[12]

This rule has been applied by other courts presented with adjudications involving a determination of the extent of responsibility owed by the Government to employees of independent contractors engaged in the repair of Government-owned ships. Thus, in McKinney v. United States,[13] where such an employee was injured by breathing fumes generated when he welded, the court found that the Government was not negligent since the employee:

"* * * was solely and exclusively subject to the supervision of Lockheed supervisory personnel in the performance of his duties. No naval personnel issued any orders or directions to McKinney relating to the manner of the performance of his work or to the safety precautions which should be observed. No navy personnel were ever aboard the mid-body section except for inspectors who checked to see if the work was being done pursuant to the contract specifications."[14]

Likewise, in McDonald v. United States,[15] where a painter employed by an independent contractor sustained injuries while engaged in the repair of a ship preparatory to its being placed in the "mothball" fleet, and claimed that the

10. See 46 C.F.R. § 97.37–3(a) (1970):
   "It is the intent of this subpart to provide such markings as are necessary for the guidance of the persons on board in case of an emergency. In any specific case, and particularly on small vessels, where it can be shown to the satisfaction of the Officer in Charge, Marine Inspection, that the prescribed markings are unnecessary for the guidance of the persons on board in case of emergency, such markings may be modified or omitted." See also § 97.37–90(a) (1), *supra,* note 7.

11. 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed. 2d 161 (1959).

12. *Id.* at 123, 80 S.Ct. at 193.

13. 368 F.2d 542 (9 Cir. 1966).

14. *Id.* at 543.

15. 321 F.2d 437 (3 Cir. 1963), cert. den. 375 U.S. 969, 84 S.Ct. 487, 11 L.Ed.2d 417 (1963).

Government had failed to provide him with a safe place to work, the court denied recovery and stated that:

> "The shipowner in possession and control owes a duty of reasonable care to workmen who come aboard the vessel to make repairs. The duty is to exercise reasonable care to furnish the workmen with a safe place to work [citations]. However, the test of the shipowner's responsibility is possession and control. Where, as here, possession and control of the vessel are relinquished to an independent contractor, the shipowner owes no duty to the contractor's employees." [16]

Since in the present case the New York Shipbuilding Corporation was clearly an independent contractor, the burden of proof rested upon appellant to demonstrate that the Government had retained control of safety precautions while repairs were in progress. On the basis of the testimony of witnesses for appellant and appellee, including the testimony of appellant himself, and on a consideration of the contract between the Government and New York Shipbuilding, the District Judge found that appellant had not sustained his burden of showing that the Government retained control over safety precautions on the S.S. Exhibitor. A review of the record as a whole indicates that this decision was proper.

Robert Irving Ivans, an inspector for the Coast Guard Marine Inspection Office, testified that his function aboard the S.S. Exhibitor was to assure that the repair work complied with Coast Guard regulations.[17] To this end, he could request changes and repairs in work which he found did not meet Coast Guard specifications. Such requests were submitted to John Murtha, a representative of the Maritime Administration, for ultimate approval. Mr. Ivans testified that, of the three Government employees aboard the ship, one was authorized to approve repairs and the other two to assure that the repairs satisfied Coast Guard regulations. He stated that he had inspected the lifeboat in which appellant was injured and found its disengaging apparatus to be in satisfactory condition. In addition, he stated that when the lifeboat was placed back on the ship after repair, he was only to see that the water weight test was performed to his satisfaction as inspector. He further testified that employees of New York Shipbuilding had rigged the lifeboat in outboard position. He was not present when that was done, but stated that no warnings are usually given that such a test is about to be performed.

An employee of the contractor, Edward W. Eldred, Jr., later testified that as rigging subforeman his duties included supervising the rigging of lifeboats onto vessels and assigning crews to do the work. He further testified that he could make changes if he saw something he did not like.[18] Appellant

---

16. *Id.* at 440–441. See also Allen v. United States, 178 F.Supp. 21 (E.D.Pa. 1959).

17. On direct examination Mr. Ivans testified as follows regarding his duties with respect to repair operations:
    "Q * * * I am trying to find out what your duties were, sir."
    * * * * *
    "A If they [repairs] did not meet the Coast Guard requirements applicable to the lifeboats, then I would write up the requirement on it, stating it was more or less unsatisfactory, and that is as far as I went with it.
    "Q And, of course, the purpose of that is so that changes could be made by the contractor; is that right?

"A Well, eventually, yes, the contractor or the ship's force."
    * * * * *
    "* * * I didn't care who did it, just—
    "Q As long as it was done?
    "A As long as it was done satisfactory to my office.
    "Q Fine. And by your office you mean the Coast Guard?
    "A I mean the Coast Guard Marine Inspection office."

18. On direct examination Mr. Eldred testified as follows:
    "Q Now, as Rigger Subforeman * * * what were your duties, Mr. Eldred?

himself testified that he was under the direct supervision of his foreman, an employee of the contractor, and that his foreman had instructed him to paint the lifeboat without giving any warning of the possible dangers involved. This testimony, as well as the contract between the Government and New York Shipbuilding[19] support the inference that the Government had relinquished control of the S.S. Exhibitor, and that Government employees were present only in the capacity of inspectors. In this respect, the present case differs from Kleveland v. United States,[20] much relied on by appellant, where the Government was held liable for the injuries of an employee of an independent contractor engaged in ship repair work on the finding of the court that:

"The conduct of the parties itself indicates that the United States took responsibility for making a check of the ship's accessories after years of disuse, and it is liable for failure to use due care in this although not for defects produced by Agmarine's [the contractor] own work."[21]

"A Well, everything pertaining to repair work, as far as rigging goes."

\* \* \* \* \*

"Q As part of your duties at that time, did they include rigging lifeboats onto vessels?

"A Yes, to supervise it and assign the work to a crew, \* \* \* and if I see something I don't like, I change it \* \* \*"

"Q Now, did you or your men have anything to do with putting the lifeboats back onto the Exhibitor before the accident?

"A Oh, definitely; *we were the only ones could do it.*" [Emphasis supplied.]

19. Appellant argues that the Government's retention in the contract of a right to have safeguards installed upon its request is not consonant with a relinquishment of control. Other contract provisions, however, indicated that the contractor was to have charge of and be responsible for the vessel "from the time

Here appellant did not show that the Government intended to retain control over the ship, or that it had accepted responsibility for safety operations while repairs were ongoing. Even assuming that the Government's inspectors at least had a duty to correct all dangerous conditions of which they had actual knowledge and that one of them knew that the contractor had removed the safety wires required by 29 C.F.R. § 1501.56 preliminary to the weight test, there is no evidence to charge them with knowledge prior to the accident that any painting would be performed on the lifeboat before the weight test was to be conducted.

Having disposed of the issue of negligence in favor of the Government, it follows that any discussion of the issue of proximate cause is rendered unnecessary. The District Judge correctly concluded that the responsibility for this unfortunate accident must fall upon either the contractor, appellant, or both, and that the Government cannot be held liable therefor.[22] The Judgment of the District Court of February 16, 1970 will be affirmed.

the Contractor's lines are secured to the vessel until such time as all of the Contractor's lines are cast off"; that "(d)uring the Contractor's performance thereof, the work shall be subject to inspection and test by the authorized representative of the Authority at any and all times and places"; and that Government personnel "assigned to duty on the vessel shall have access to the vessel at all times, provided such personnel shall not be permitted to interfere with the work of the Contractor's workmen." These provisions effectively refute the contention that the Government retained control over safety precautions on the ship.

20. 345 F.2d 134 (2 Cir. 1965).

21. *Id.* at 136.

22. See Manhat v. United States, 220 F.2d 143 (2 Cir. 1955), cert. den. 349 U.S. 966, 75 S.Ct. 900, 99 L.Ed. 1288 (1955); Morrell v. United States, 297 F.2d 662 (9 Cir. 1961), cert. den. 370 U.S. 960, 82 S.Ct. 1615, 8 L.Ed.2d 826 (1962).