561 So.2d 666 (1990)
Gloria E. KIRBY, As Personal Representative of the Estate of Roy A. Kirby, Sr., Deceased, Appellant,
v.
OMI CORP., a Foreign Corporation, Appellee.
No. 89-664.
District Court of Appeal of Florida, First District.
May 14, 1990.
Rehearing Denied June 15, 1990.
*667 C. Rufus Pennington, III, of Margol & Pennington, Christian, Prom, Korn & Zehmer, Jacksonville, for appellant.
George D. Gabel, Jr., of Gabel, McDonald, Anderson & Dees, Jacksonville, for appellee.
ALLEN, Judge.
Gloria E. Kirby, personal representative of the estate of Roy A. Kirby, Sr., deceased, sued OMI Corp. (OMI) for damages alleging that the decedent was killed as a result of the negligence of OMI. A jury found for the appellant and awarded damages, but the trial court granted OMI's post-trial motion for judgment in accordance with its motion for a directed verdict, and entered final judgment for OMI. Ms. Kirby appeals from that judgment, contending there was sufficient legal and factual basis for the verdict. We disagree, and affirm.
OMI was the owner of the oil tanker OMI Wabash. In December of 1985, the OMI Wabash was delivered to the North Florida Shipyards (shipyard) in Jacksonville, Florida, to undergo repairs and to have a new ballast system installed. OMI furnished plans and drawings that had been prepared by Anthony Cimmino, a marine engineer. As a part of the new ballast system, Cimmino's plans called for use of a dresser coupling to connect a length of pipe to a shorter length of pipe and suction valve in the 2C tank. Although the dresser coupling had been used in this location without incident prior to the modifications, the modified pipeline was to be capped just *668 beyond the dresser coupling and suction valve. Previously this line extended all the way to a bulkhead, where it was welded in place.
A dresser coupling is an expansion joint which connects two pieces of pipe. Although a dresser coupling has the advantage of permitting a slight amount of movement in a pipeline, it is prone to "creeping" along the pipeline, which can result in disconnection of the pipes. To prevent a dresser coupling from moving along a pipeline, stops can be attached to one end of the coupling, which fixes it to one of the pieces of pipe. This arrangement prevents creeping while still allowing for movement in the pipes. Even with stops, it is sometimes possible for the joint to separate if the pipes themselves are capable of too much movement. As a result, the pipes sometimes must be restrained in some manner.
On the morning of January 15, 1986, the ship's chief mate, John O'Boyle, inspected the pipeline in tank 2C. Upon inspection, O'Boyle determined that, as a result of the modifications, the dresser coupling was insufficient to connect the short section of pipe containing the suction valve to the longer section of pipeline. O'Boyle brought this to the attention of OMI's port engineer, Walter Gustafson. Gustafson and the shipyard's ship superintendent, Oland Cutchin, then examined the pipeline and dresser coupling and agreed with O'Boyle's assessment. It was their opinion that stops and restraints, which had not been called for by Cimmino's plans, should be installed. Gustafson instructed Cutchin to correct the situation. Following his conversation with Gustafson, Cutchin gave instructions to shipyard employees for the stops and restraints to be installed.
A short time thereafter, Cutchin ordered that the pipelines be filled with water for a hydrostatic test. In a hydrostatic test, the pipeline is filled with water and placed under high pressure to determine whether there are leaks or weak spots in the line. At trial, the following exchange took place between Cutchin and OMI's counsel:
[COUNSEL] Did the port engineer or anyone from the OMI WABASH have anything to do with scheduling that hydrostatic test?
[CUTCHIN] No, sir.
[COUNCIL] For whose benefit was the hydrostatic test to be conducted?
[CUTCHIN] The test was being conducted for our benefit, to try to discover any leaks in the cargo system.
[COUNSEL] Was the port engineer invited to observe the test?
[CUTCHIN] No, sir.
Unknown to Cutchin, the decedent and other shipyard employees were already in the 2C tank installing the restraints when the hydrostatic test was conducted. As the workers installed the first restraint, the line suddenly blew apart at the coupling. Water gushed from the pipe with such force that decedent was thrown through the air and fatally injured. OMI's counsel elicited the following testimony:
[COUNSEL] Mr. Cutchin, did you know that Mr. Kirby was doing that repair at the time you made the decision to start the hydrostatic test?
[CUTCHIN] No, sir. If I had of, I would not have started the hydrostatic test.
[COUNSEL] And why is that?
[CUTCHIN] Well, you're never supposed to hydrostatically test a line if someone is working on it. Never.
[COUNSEL] As between the owner of the OMI WABASH and North Florida Shipyard, who was responsible for making sure that Mr. Kirby was not in that tank working on this pipe during the hydrostatic test?
[CUTCHIN] Unfortunately, we are, North Florida Shipyard.
John Bell, a marine engineer, provided expert testimony at trial. He stated that the plans furnished by OMI "contained errors of omission that contributed to the cause" of the accident. Specifically, he said that the plans neglected to provide for restraints after the pipeline was detached from the bulkhead and capped. Other expert testimony indicated that even the restraints ordered by Gustafson and Cutchin *669 would have been inadequate to properly secure the pipes and avoid a sudden separation under pressure.
On September 30, 1988, four days following a jury verdict in favor of appellant, OMI filed a motion for judgment in accordance with its motion for directed verdict. The trial court granted the motion on March 2, 1989. The trial court found that the ship's plans, even if defective, were not the proximate cause of decedent's fatal injuries. The court reasoned that, despite the plans, all parties had knowledge of the defect prior to the accident. Since OMI asked the shipyard to correct the defect, it could not be held liable when the shipyard's repair effort ended in injury. The court further stated:
There can be no other conclusion drawn from the evidence in this case but that the dangerous condition which caused the accident was the conducting of a hydrostatic test on the piping system of the OMI WABASH at the same time that repairs were being made by Mr. Kirby on the pipe being tested. The ship owner had no actual knowledge as to when the hydrostatic test would be conducted; it had no actual knowledge as to when the repairs were going to be made; and, therefore, it had no actual knowledge of the dangerous condition which caused Mr. Kirby's death.
Subsequently, judgment was entered in favor of OMI based on the trial court's order.
In reviewing the propriety of a directed verdict, an appellate court must view the facts and inferences to be drawn therefrom in the light most favorable to the person against whom judgment has been granted. A directed verdict can be upheld only if there is no evidence or reasonable inference from the evidence which will support the non-moving party's position. Gant v. Lucy Ho's Bamboo Garden, Inc., 460 So.2d 499, 501 (Fla. 1st DCA 1984).
Before beginning our discussion of the appellant's arguments, we observe that in 1972 Congress amended the Longshoremen's and Harbor Workers' Compensation Act by adding 33 U.S.C. § 905(b). This provision altered the shipowner's duty to longshoremen and workers engaged in ship repair. Prior to amendment, recovery for injuries could be based upon the shipowner's warranty of seaworthiness. The amendment abolished this theory of recovery, but still provided that an injured worker could recover against the vessel for its negligence.
Appellant first asserts that the shipowner breached its duty of reasonable care by providing defective plans, and that this proximately caused her husband's death. Although the evidence is sufficient to establish that the plans were defective, it is not possible to conclude that these defects proximately resulted in the death of appellant's husband. All of the evidence demonstrates that the shipyard was aware of the defective condition, and that the shipowner instructed the shipyard to install restraints. Appellant responds by arguing that the shipowner's actions did not cure the defect because, according to expert testimony, the arrangement of restraints ordered by the shipowner would still have been insufficient had they been installed. Appellant fails to recognize, however, that the death did not occur as a proximate result of defective plans or defective modifications to plans. Rather, the fatal injuries resulted from scheduling a hydrostatic test while workers were repairing the pipeline. It was unrebutted that a test should never be conducted on a pipeline while shipyard workers are working on the same line. Thus, it is irrelevant whether the defects in the original or modified plans were cured by the shipowner's actions on the day of the accident. These actions are only relevant in that the shipyard was instructed to make repairs and that decedent was killed in the course of performing the work. Under these circumstances the shipowner is relieved of responsibility, not because of the soundness of its modifications from an engineering perspective, but based upon the well-established principle that a shipowner is not liable when a repairman is injured by the very condition he is hired to correct. See West v. United States, 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d *670 161 (1959); Peters v. Titan Navigation Co., 857 F.2d 1342 (9th Cir.1988).
The instant case is similar to Peters, which involved a ship that had been converted from a natural gas carrier to a bulk products carrier. As a result of the conversion, the ship experienced repeated failures in its hydraulic system, and arrangements were made with a shipyard to effect repairs. When the plaintiff, a shipyard worker, entered the pump room to inspect the hydraulic system, he immediately terminated the inspection when he recognized that the system had sprayed hydraulic fluid throughout the room and upon a staircase. Although the shipyard dispatched a crew to clean the room, the room had not been thoroughly cleaned when the plaintiff returned the next day. Deciding to proceed with the repairs, plaintiff slipped and injured himself when he fell down the oily staircase. Although the shipowner recognized that the conversion was inadequately performed, the court held that the shipowner could not be found liable since the plaintiff was injured by the very condition he was hired to repair. In the instant case, Mr. Kirby was killed while engaged in repair of the defective pipeline. Thus, OMI could not be found liable.
Next, appellant contends that there was a separate basis for finding OMI negligent. Appellant contends that OMI negligently failed to intervene to prevent the performance of a hydrostatic test on the pipeline while the decedent was repairing the line.
In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court explained the duties that § 905(b) of the Longshoremen's and Harbor Workers' Compensation Act imposes upon a shipowner. The Court stated:
We are of the view that absent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.
Id. at 451 U.S. 172, 101 S.Ct. at 1624. This applies equally to shipyard repair operations. Hill v. Texaco, Inc., 674 F.2d 447 (5th Cir.1982).
An exception to the general principle announced in Scindia provides that a shipowner has a duty to intervene to protect a longshoreman or shipyard worker where two conditions exist. The shipowner first must have actual knowledge of a danger on the ship, and second, must know that the stevedore or shipyard is failing to take reasonable steps to protect their workers from the danger. See Scindia, supra at 451 U.S. 175-176, 101 S.Ct. at 1626-1627; Casaceli v. Martech Int'l, Inc., 774 F.2d 1322, 1328 (5th Cir.1985); Futo v. Lykes Bros. S.S. Co., Inc., 742 F.2d 209, 214 (5th Cir.1984); and Murray v. Gulfcoast Transit Company, 529 So.2d 784 (Fla. 2d DCA 1988). This exception is clearly inapplicable to the present case. All of the evidence demonstrates that the shipowner was unaware of the hydrostatic test, and was therefore in no position to intervene to prevent the accident. By way of analogy, see Mozee v. Champion Int'l Corp., 554 So.2d 596 (Fla. 1st DCA 1989), and cases cited therein.
In summary, we find neither of appellant's arguments in support of reversal of the trial court's directed verdict to be persuasive. On the contrary, it appears that judgment in favor of appellee was mandated by the controlling precedents.
In light of our affirmance of the trial court's ruling on the motion for directed verdict, we need not address appellant's remaining points on appeal.
The trial court's judgment is affirmed.
BOOTH and JOANOS, JJ., concur.