Raymond ALPHIN

v.

MARQUESA MARITIME, S.A.

v.

ATLANTIC & GULF GRAIN STEVEDORING ASSOCIATION.

Civ. A. No. B–86–0673–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

June 20, 1990.

Charles B. Smallwood, Waldman, Small-wood & Grossman, Beaumont, Tex., for plaintiff.

Hubert Oxford, Benckenstein, Oxford & Johnson, Beaumont, Tex., for defendant.

O.J. Weber, David Gaultney, Mehaffy & Weber, Beaumont, Tex., for third party defendant.

## MEMORANDUM OPINION

COBB, District Judge.

On October 10, 1985, the M/V LA MAR-QUESA was docked in the Port of Beaumont, Texas. Plaintiff Raymond Alphin, a grain inspector, was performing his job aboard the vessel in the course of the grain-loading operation. After walking through wet grain dust, Alphin slipped as he was stepping up to the gangway. Alphin alleged he sustained back injuries as a results of this fall.

Alphin sued Marquesa Maritima, S.A., under the admiralty and maritime jurisdiction of this court. Atlantic & Gulf Grain Stevedoring Association was the contract stevedore for the grain-loading operation, and was brought in as a third-party defendant. The issues in this case are: (1) whether Alphin's fall was due to his own negligence, or to the defendant's negligence; (2) whether Alphin's back injury was proximately caused by the fall. This court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Raymond Alphin, plaintiff, is a citizen of the State of Texas. At the time of the accident on October 10, 1985, plaintiff was forty-eight (48) years old. The plaintiff is now fifty-three (53) years old. The parties have stipulated that the plaintiff was employed by Federal Grain Inspection Service.

(2) The Marquesa Maritima, S.A., is a foreign corporation doing business in the United States and from time to time within the navigable waters of Texas. The parties have further stipulated that Marquesa Maritima, S.A., at all times material to this lawsuit, manned and operated the M/V "LA MARQUESA." Atlantic & Gulf Grain Stevedores hired and directed the long-shoremen on board the M/V "LA MAR-QUESA" for grain-loading operations on October 10, 1985.

(3) The captain of the vessel was Hideosugi Yama and the Chief Officer was Yujiroo Yamamoto. The Captain has thirty-eight (38) years of experience and the Chief Officer has thirty (30) years of experience. The M/V "LA MARQUESA" was a two-year old cargo vessel in October of 1985. The ship, including the accommodation ladder, passed inspection in Panama.

(4) The plaintiff was an experienced grain inspector. For fifteen (15) years, the plaintiff performed grain inspections on ships, including working on the sampling crew, working as a foreman, and being licensed as a grain inspector for six (6) years. Plaintiff has undergone extensive government training, including safety classes. He is familiar with the safety regulations as set up by the United States Department of Agriculture. Instruction by the safety classes covered the need for caution in walking on a ship deck coated with wet grain dust.

(5) Plaintiff has worked at the grain elevator in the Port of Beaumont for approximately ten (10) years. He was familiar with the work conditions, including the con-

ditions which existed at the time of the accident.

(6) As a grain inspector, plaintiff would climb down into the hold of a ship to inspect for cleanliness, walk around the ship to determine whether the grain is being loaded in the right holds, and take samples of the grain for later inspection. Typically, the plaintiff would make several inspections aboard a ship, and would be walking on and off the ship, via the gangway. On the night of the accident, Mr. Alphin's primary duty was to check the flow of the grain, and ascertain that the samples were the same class as the grain that was being pumped on the loading belt. As the grain goes down the loading chute into the hold of the ship, it creates grain dust. No matter what type of grain is being loaded, there will be a cloud of grain dust coming out of the hold. The dust will settle on the deck of the ship throughout the entire loading process. Since the dust is continuously falling, it is not possible to keep the deck clean.

(7) Further, the grain dust could not be washed off the deck of the vessel while it was in port because the Refuse Act of 1899 prohibits the "throw[ing], discharg[ing], or deposit[ing] ... from or out of any ship, barge, or other floating craft ... any refuse matter of any kind or description ... into any navigable water of the United States...." 33 U.S.C. § 407. The grain dust had to remain on the deck.

(8) If there is high humidity, mist, or light intermittent rain, the grain dust will be wet on the deck of the ship. When the grain dust is wet, the slipperiness of the deck will increase. Still, there is no way for the deck to be cleaned, because the grain dust will merely keep falling after the initial attempt to clean the deck. On the night of the accident, the weather was very humid and water had condensed on the ship's metal surface. As the dust settled on the wet deck, it became very slippery.

(9) Because of his years of experience as a grain inspector, Alphin was very much aware of the slippery conditions caused by wet grain dust and the necessity to use extreme care when walking through wet grain dust.

(10) There was a normal amount of light on the ship and on the dock. There were lights in the ship that was being unloaded, lights in the grain elevator, lights on the boom from the grain elevator, and lights on the dock of the Port of Beaumont. The lighting was adequate.

(11) During grain-loading operations, the ship's crew turns the control of the vessel over to the stevedore. The stevedore has responsibility for cleaning any area affected by the operation, during and after the grain-loading operations. The ship's crew are not involved in the clean-up either during or after the grain-loading operations. Neither the stevedore nor the ship's crew could wash the grain dust off the deck with a hose, either during or after the grain-loading operations, because of the federal prohibition of harbor pollution.

(12) On October 10, 1985, the vessel was docked and the stevedores had been engaged in bulk grain loading operations since 7:15 p.m. Since the stevedore begins filling the grain hold at the bottom, there is normally little grain dust produced during the first three to four hours of loading. However, there was high humidity, and any fallen grain dust would probably be wet or damp. At 10:00 p.m., Alphin had been walking around the ship in the course of his inspection and was intending to exit the ship via the gangway. He had to step onto a small platform prior to descending the gangway. The platform had non-skid ridges. There are handrails for both hands. The handrails to the gangway and the platform to the gangway are suitable for their purpose and were properly maintained in good condition.

(13) As Alphin was stepping from the deck of the ship to the gangway, he put his right foot up on the platform to the gangway, and grabbed the right handrail. When plaintiff's right foot slipped, he spun around on his right hand and his left hand hit a part of the ship.

(14) After the fall there was some blood on Alphin's right leg and pain in his left index finger. Alphin showed his leg to his

supervisor Warren O'Dell who gave permission for Alphin to receive medical treatment. Alphin went to Baptist Hospital where the doctors put three or four stitches in the shin of his right leg. In the Baptist Hospital emergency room, Alphin made no complaints about his leg or back pain on October 10, 1985.

On October 15, 1985, Alphin was seen in the emergency room of Baptist Hospital. He made no complaints about any back or related leg pain. He complained that his finger was swollen, but X-rays were negative for a fracture. On October 18, 1985, Alphin was seen in the Baptist Hospital Emergency room to remove the previous sutures. Alphin did not complain of back or related leg pain. Alphin was again seen in the emergency room of Baptist Hospital on October 28, 1985, and made no complaint about his leg or back pain. The doctors in the emergency room recommended that he see Dr. Taylor, an orthopedic surgeon, for his hand.

Alphin first saw Dr. John Taylor on November 4, 1985. Alphin made no complaints about any back or related leg pain. Dr. Taylor put on a dynamic splint on Alphin's finger to allow movement. Dr. Taylor next saw Alphin on November 20, 1985. Alphin made no complaints about any low back or left leg pain. Dr. Taylor saw Alphin again on December 11, 1985, and again Alphin made no complaints about his back or left leg pain. Dr. Taylor started physical therapy for his hand. Alphin saw the physical therapist on December 12, 17, 27, and 31, 1985. Alphin made no complaint of back or related leg pain.

Alphin saw Dr. Taylor on January 2, 3, and 21, 1986, and again made no complaints about any back or left leg pain. Dr. Taylor sent Alphin to Dr. Bennett for a second opinion as to whether there was an objective reason why Alphin should be complaining of finger pain. He did not think Alphin would benefit from hand surgery. He allowed Alphin to be off from work until he saw Dr. Bennett.

Alphin saw Dr. Bennett on February 4, 1986. Dr. Bennett did not recommend surgery for his hand. Alphin made no complaints about any back or related leg pain.

In March of 1986, Alphin's attorney referred him to Dr. Ratnarajah. Before seeing Dr. Ratnarajah, Alphin had never complained to any doctor about his back or leg pain. Alphin saw Dr. Ratnarajah on March 12, 1986. Subsequently, Alphin's attorney further recommended that he see Dr. Brodski. Dr. Brodski performed a back operation on Alphin in the summer of 1986.

Subsequently, Alphin saw Dr. Davis who performed a fusion to correct the problem from the first back operation. Alphin's right leg and his left hand have healed. Alphin complained of no pain in his back and left leg when last seen by Dr. Davis in October of 1988.

(15) Alphin suffers from congenital spondylolisthesis, a congenital defect in the back where the neural arch does not fully join together. As a person with such a defect grows older, one vertebra will slip over the adjoining vertebra because of the lack of normal support in the area. Although the defect can be aggravated by trauma, credible medical testimony established to a reasonable medical probability that the disabling symptoms from an aggravation of spondylolisthesis would manifest in a reasonably short period of time, three or four weeks at most.

(16) Accordingly, Alphin's leg and back pain was not proximately caused by the defendants' negligence, nor even by the accident in question. If Alphin's leg and back complaints had been the result of the accident in question, the complaints would have been manifested prior to March 1986, according to the greater weight of the expert testimony.

(17) Alphin's hand and right leg injuries were not permanent, so he has not sustained any future damages or loss of earning power.

## CONCLUSIONS OF LAW

(1) This court has jurisdiction over all the parties, and has subject matter jurisdiction of this lawsuit under its admiralty and maritime jurisdiction, since the injury occurred

on a commercial shipping vessel over navigable water.

■ (2) Negligence principles of the general maritime law control this case. Since Alphin is not a seaman, the Jones Act does not apply. Since Alphin is not a worker under the Longshore Act, the Longshore Act does not apply.

■ (3) The general maritime law does not recognize the business invitee/licensee distinctions of land-based tort law. *Kermarec v. Compagine Geneorale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). The plaintiff must prove the fault of defendant in not adhering to the standard of reasonableness. One aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. *West v. United States*, 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d 161 (1959). The shipowner's duty to exercise reasonable care to furnish a safe place to work does not impose liability apart from fault. *Id.*

■ (4) A worker, such as a grain inspector, performing his duties in the course of employment, must exercise some responsibility for his own safety in the face of unavoidable risks which did not arise out of negligence. Such a worker cannot recover for injuries resulting solely from such inherent and unavoidable risks. *Marshall v. Neptune Maritime, Inc.*, 838 F.2d 737, 738 (5th Cir.1987). An experienced worker should expect some grain residue on a vessel designed to carry grain, and slippery footing from such residue is a limited and accepted hazard. *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 884 (5th Cir.1983). *Stass* compares the danger inherent from grain dust to the inherent danger faced by ship repair/inspection workers who are injured by the condition that they are supposed to inspect or repair. *See Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir.1982). In longshore cases in this circuit, the courts have noted that grain dust settling on the deck of a vessel is a natural, normal occurrence during grain-loading operations. This slippery footing poses only a limited and accepted hazard. *Thompson v. Cargill*, 585 F.Supp. 1332, 1335 (E.D.La. 1984); *Giacona v. Marubeni Oceano Corp.*, 623 F.Supp. 1560, 1565 (S.D.Tex. 1985). *See also, Meserole v. M/V FINA BELGIQUE*, 736 F.2d 147, 150 (5th Cir. 1984) (summary judgment aff'd against longshoreman who was injured while doing repair work because he should expect a film of oil in the engine room).

■ (5) The court concludes that the defendants have not breached their duty of behaving reasonably, since there is nothing the defendant, Marquesa Maritima, or the defendant Atlantic Gulf & Grain Stevedores could have done which would have prevented the fall. The court finds that the plaintiff is 100% negligent. Had the plaintiff placed both hands on the platform/ladder leading to the gangway before attempting to step up, the accident in question could have been prevented.

(6) The plaintiff takes nothing. Costs are awarded to the defendants.

(7) This opinion will serve as the court's Findings of Fact and Conclusions of Law in accordance with Rule 52(a), FED.R.CIV.P. To the extent any of the findings of fact are conclusions of law, or conclusions of law are findings of fact, they shall be considered accordingly.