Cecil D. ROGERS, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Third-Party
Plaintiff-Appellee,

v.

JACKSONVILLE SHIPYARDS, INC.,
Third-Party Defendant-Appellee.

No. 31000.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1971.

Rehearing Denied Feb. 9, 1972.

Billy J. Sanders, Sanders & Sanders and Waldman & Smallwood, Ned Johnson, Beaumont, Tex., Robert M. Smith, Jr., Jacksonville, Fla., for plaintiff-appellant.

Raymond D. Battocchi, Atty., Dept. of Justice, Washington, D. C., U. S. Atty., Jacksonville, Fla., Alfred H. O. Boudreau, Jr., Admiralty & Shipping Section, L. Patrick Gray, III, Asst. Atty. Gen., John L. Briggs, U. S. Atty., Morton Hollander, Michael C. Farrar, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

John E. Houser, Jacksonville, Fla., for Jacksonville Shipyards Inc.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

This is an appeal from the district court's judgment based upon a determination that a warranty of seaworthiness did not extend to a shipyard pipefitter who was injured while working aboard a ship that had just come out of drydock. We reverse.

The USNS REDSTONE, a government missile tracking ship, arrived at the Jacksonville Shipyards under its own power on May 11, 1968, for minor repairs and alterations. These reparations included cleaning, painting, part replacement, polishing the propeller, and the addition of a new sea chest. To install the sea chest a hole 18″ x 21″ had to be cut into the hull below the water line and piping was added to carry the sea water coolant back to the Auxiliary Machine Room (AMR). On May 16, 1968, the ship was placed in drydock to perform some of this work. Two days later the ship was removed from drydock and tied to a pier at the shipyard. The boilers and generator had been shut down and the ship utilized shore-based power.

On May 21, 1968, one day before the repairs were completed, Rogers was injured while installing sea chest piping in the AMR. The AMR space is filled with large machinery. In order to facilitate movement, deck plating is placed on angle irons that run between the machinery. Rogers and other repairmen working in these spaces had to remove this decking and lower themselves into the bilge to install the piping. To retrieve some needed tools Rogers lifted himself out of the bilge and while walking along the angle irons out of the AMR he slipped. He did not fall but the jolt further aggravated an existing back injury. He contends that oil and water in the bilge collected on the soles of his shoes and caused him to slip.

Rogers' suit is premised on the theories that the water and oil in the bilge amounted to an unseaworthy condition that caused his injury and, alternatively, because of this condition the shipowner breached his duty to provide Rogers with a safe place to work. Because we reverse the judgment on the ground that the oil and water in the bilge created an unseaworthy condition and that the warranty of seaworthiness extends to Rogers, we discuss only the law and facts pertinent to that cause of action.

The evidence is conflicting concerning the existence of water and oil in the bilge and its origin. The district court found, however, that the oil came from the machinery in the AMR and that the water spilled into the bilge when Rogers and his co-workers cut into existing water lines while installing the new pipe. We accept this finding.

The district court concluded that the warranty of seaworthiness did not extend to Rogers because (a) the REDSTONE was not in navigation at the time of the injury; (b) Rogers was not performing seaman's type work; and (c) the ship was under the control of the shipyards. While we do not question the underlying facts, we find the conclusions based upon them to be erroneous. Although these findings are usually denominated as factual, *see e. g.*, Roper v. United States, 1961, 368 U.S. 20, 23, we do not review them with an eye on F.R.Civ.P. 52(a) because they were induced by faulty legal standards. Manning v. M/V Sea Road, 5 Cir. 1969, 417 F.2d 603, 607.

It is now well settled that the warranty of seaworthiness may extend to shore based repair workers. The Tungus v. Skovgaard, 1959, 358 U.S. 588; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406. To determine whether the warranty is owed to Rogers we must focus ". . . upon the status of the ship, the pattern of repairs, and the extensive nature of the work contracted to be done, . . ." West v. United States, 1959, 361 U.S. 118, 122; Delome v. Union Barge Line Co., 5 Cir. 1971, 444 F.2d 225, 231. Applying the facts to this test we find that the REDSTONE was in navigation and that Rogers was performing work traditionally engaged in by seamen.

## The REDSTONE Was in Navigation

■ In concluding that the RED-STONE was not in navigation the district court said, "the warranty of seaworthiness is extended to no one while a vessel is in drydock or thereafter until the vessel is ready for sea."[1] This is not a correct statement of the law. *See* Delome v. Union Barge Line Co., *supra* at 230–231. Of course, if a vessel is not in navigation the warranty of seaworthiness to shore workers will not apply. Roper v. United States, *supra* at 23–24; Johnson v. Oil Transport Co., 5 Cir. 1971, 440 F.2d 109, 111. But the fact that a ship is or was in drydock is but one of the factors that must be considered in determining whether the vessel is in navigation.

■ *Roper* teaches that "the test for determining whether a vessel is in navigation is the 'status of the ship,'" West v. United States, 361 U.S. 118, 122 (1959)." In *West* the ship had been in "moth-balls" and was undergoing renovation to make her seaworthy again. Because of the magnitude of the undertaking and the fact that the contractor had complete control of the ship for this purpose, the Court held that the ship was not in maritime service (navigation). Here the REDSTONE, far from being in moth-balls prior to undergoing repairs, was actively engaged in maritime commerce and immediately resumed these activities upon completing ten days of repairs.

In assaying the status of the REDSTONE we look also to the type repairs the contractor performed. Delome v. Union Barge Line Co., *supra* at 232. Most of the REDSTONE work was replacing and cleaning parts and equipment. One of the more extensive items was the installation of a new sea chest, but even this cannot be considered a major repair or a structural change in the ship. The cost of the repairs, $91,142, does not indicate that this was a major undertaking. The repairs here are similar to those in Union Barge Line Corp. v. Allen, E.D.La.1965, 239 F.Supp. 1004, aff'd, 5 Cir. 1966, 361 F.2d 217 and Lawlor v. Socony-Vacuum Oil Co., 2 Cir. 1960, 275 F.2d 599, cert. denied, 363 U. S. 844. They are not sufficient, in legal contemplation, to take the ship out of navigation.

The status of the ship test also encompasses the question of the control of the ship. *See*, Watz v. Zapata Off-Shore Co., 5 Cir. 1970, 431 F.2d 100, 108. The trial court's finding that the RED-STONE was under the control of the shipyard is clearly erroneous. The crew were on board performing their normal duties. Logs were kept, watches were stood, and machinery in the AMR was operated. Crew members were working in the AMR on the day of the injury. The crew even undertook to pump the bilge where Rogers was working. Even if the yard workers had control over the particular areas where they were working, and here they did not, the warranty survives when the owner remains in general control of the vessel. Johnson v. Oil Transport Co., *supra* at 114; Lawlor v. Socony-Vacuum Oil Co., *supra* at 604.

■ The district court's conclusion that the warranty of seaworthiness will not extend to a shore-based worker when the owner has relinquished control of the ship to the contractor, in addition to being premised on a clearly erroneous fact finding, appears to be a variation

---

1. The court relied upon Alfred v. M/V Margaret Lykes, 5 Cir. 1968, 398 F.2d 684; Latus v. United States, 2 Cir. 1960, 277 F.2d 264; and Union Carbide Corp. v. Goett, 4 Cir. 1958, 256 F.2d 449 as support for this precept. *Alfred* involved a vessel being newly constructed and the ship in *Latus* was being reconditioned from a "moth-balled" status; thus these cases are clearly inapposite. The *Goett* court found on the facts in that case that the warranty of seaworthiness did not extend to a shipyard worker injured aboard a drydocked ship but the court did not hold that the warranty is extended to no one while the ship is in drydock.

of the relinquishment of control doctrine that was put to rest in Petterson v. Alaska S. S. Co. Inc., 9 Cir. 1953, 205 F.2d 478, aff'd, 1954, 347 U.S. 396. Control of the ship is a factor that is taken into account when determining the ship's status, as pointed out *supra*, but it is not a condition which, without more, negates the warranty of seaworthiness. *See* Watz v. Zapata Off-Shore Co., *supra* at 106, 108; *Cf.*, Parker v. Cargill, 5 Cir. 1969, 417 F.2d 773; Moye v. Sioux City & New Orleans Barge Lines, Inc., 5 Cir. 1968, 402 F.2d 239.

### Rogers Was Performing Traditional Seaman's Work

The mere fact that the shipowner contracts work to a third party in order to take advantage of the skill brought about by the modern division of labor does not release him from his responsibility of providing shore workers with a seaworthy vessel. Seas Shipping Co. v. Sieracki, 1946, 325 U.S. 85, 100. In order to come within the warranty's protection, the repair work being performed on the ship must be the type of work traditionally done by seamen. United Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 617. Applying the *West* test we must look to the pattern of repairs and the extensive or limited nature of the work contracted to be done rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of the injury in determining whether the work was traditionally that of a seaman. Delome v. Union Barge Line Co. *supra* at 232; Johnson v. Oil Transport Co., *su-*

*pra* at 117; Watz v. Zapata Off-Shore Co., *supra* at 108.

The installation of the sea chest and piping and the numerous minor refittings and additions were of the type which seamen have traditionally performed.[2] This brings Rogers within the purview of the warranty.

### Transitory Condition

The district court found that the oil in the bilge came from the operation of machinery and that cuts made in the water lines by repairmen working in the AMR accumulated water in the bilge. Relying on Parker v. Cargill, *supra*, and Patterson v. Humble Oil & Refining Co., 5 Cir. 1970, 423 F.2d 883, the shipyard argues that because Rogers and his fellow repairmen created the very condition that caused his injury, the warranty of seaworthiness is not applicable. But this does not necessarily follow. *See* Ryan Stevedoring Co. v. Pan Atlantic Steamship Co., 1959, 350 U.S. 124; Whisenant v. Brewster-Bartle Offshore Co., 5 Cir. 1971, 446 F.2d 394, 399-400. *Parker* and *Patterson* are clearly distinguishable. *Parker's* job was to clean molasses from the deck and ladders. He slipped on the molasses and was injured. The court found that the warranty did not extend to him. In *Patterson* the court refused to extend a warranty of seaworthiness to a non-crew member who created a transitory condition during the course of substantial repairs to an existing unseaworthy condition when the transitory condition related to the subject matter of the contract.[3]

---

2. Even if it were important to consider the nature of Rogers' individual task at the time of his injury, we note that pipefitters are often found among a ship's crew. *See* Pinion v. Mississippi Shipping Co., E. D.La. 1957, 156 F.Supp. 652, 657.

3. Parker v. Cargill, 5 Cir. 1969, 417 F.2d 773 and Moye v. Sioux City & New Orleans Barge Lines, Inc., 5 Cir. 1968, 402

F.2d at 238 (Brown, C. J., concurring) speak of abrogating the warranty of seaworthiness when the unseaworthiness is a transitory condition caused by the contractor. One element, the lack of control and its effect upon the navigational status of the ship, absent here was present in both these cases. Consequently, we deem them to be inapposite to this case.

The water and oil of the bilge of the REDSTONE cannot be said to be transitory [4] for Rogers had been standing in the water for several hours prior to his injury and the crew had attempted to pump the AMR bilge on numerous occasions. Nor was the condition one solely created by the repairmen. Furthermore, the installation of the new sea chest piping was not performed for the purpose of correcting the unseaworthy condition that caused the injury.

### The Vessel Was Unseaworthy

A seaworthy vessel is one "reasonably suited for her intended service." Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550. However, "the doctrine is a growing concept, constantly undergoing redefinition as the risks of those protected are enlarged by changing technology and shipboard technique." Dillon v. M. S. Oriental Inventor, 5 Cir. 1970, 426 F.2d 977, 979. What may be unseaworthiness in one instance may not be in a different circumstance.

We agree with the district court that a bilge normally collects some water and oil, but once it becomes necessary for men to stand and work in it, its purpose and function is modified. In this instance the condition was not reasonably suited for men to work in, and the ship was unseaworthy. *See* Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011, 1031–1032.

The judgment of the district court is reversed with directions to enter judgment for the appellant Rogers.

Reversed and remanded with directions.

4. The labels transitory and instantaneous when applied to an unseaworthy condition refer to the same phenomenon. *Compare* Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494 *with* Antoine v. Lake Charles Stevedores, Inc., 5 Cir. 1967, 376 F.2d 443 and Robichaux v. Kerr-McGee Oil Industries, Inc., 5 Cir. 1967, 376 F.2d 447.