**Earl Wayne COATS, Plaintiff,**

v.

**PENROD DRILLING CORPORATION, Hytorc M.E., Maritime Industrial Services, and Lee's Materials Services, In Personam, Penrod Rig No. 69, In Rem, Defendants.**

Civ. A. No. S90–0209(P)(R).

United States District Court,
S.D. Mississippi, S.D.

Feb. 18, 1992.

Maurice C. Hebert, Jr., and David M. Flotte, New Orleans, La., Raymond O. Brown, Pascagoula, Miss., for plaintiff.

Bernard Ticer and James Womack, New Orleans, La., for Penrod Drilling Corp.

William B. Gibbens, III, and Troy Ingram, New Orleans, La., for Hytorc, M.E. and Maritime Industrial Services.

Thomas W. Acosta, Jr., Port Allen, La., for Lee's Materials Services.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This cause comes before the Court on a profusion of pending motions, including: (1) Defendant Penrod Drilling Corporation's Motion for Summary Judgment; (2) Plaintiff's Motion to Strike All Defense Experts on the Issue of Foreign Law and to Strike All Foreign Law Issues, Motion to Strike Issues of Alleged Failure to Fill Lines with Hydraulic Fluid, Motion for Summary Judgment on *Sieracki* Seaman Status, Motion to Strike Affidavit of De-

fense Counsel, and Motion for a Second Declaration that United States Law Applies; (3) Defendant Lee's Materials Services' Motion for Summary Judgment; and, (4) Defendant Maritime Industrial Services Co., Inc.'s Motion for Summary Judgment. Having reviewed the various motions and the parties' memoranda and authorities related to same, the Court finds as follows:

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This action involves a maritime tort claim for injury and damages allegedly sustained by the Plaintiff, Earl Wayne Coats ("Coats"), while he was employed by Hytorc, M.E., a division of Maritime Industrial Services ("MIS/Hytorc"), and working in Dubai, United Arab Emirates ("UAE"). Coats was hired by Mr. David Shelton, head of the Hytorc Division of MIS, in Laurel, Mississippi. Shelton traveled from UAE to Laurel, Mississippi, to meet with Coats and offered Coats a job with MIS/Hytorc. Coats flew to UAE on December 1, 1987, at which time he began work for MIS/Hytorc. Coats had been working for MIS/Hytorc for several months when he was injured on April 12, 1988, while working on board the PENROD NO. 69.[1]

The PENROD NO. 69 is owned by Defendant Penrod Drilling Corporation ("Penrod") and registered in the United States with a home port of New Orleans, Louisiana. At the time of Coats' injury, the PENROD NO. 69 was located in the Port of Mina Saqr, Ras al Khaymah, one of the Emirates comprising the UAE. The rig was located against the bank with access available via a gangway. Coats was conducting pressure testing at the time of his injury. He was standing behind a stabbing board, operating a pressure pump remotely, when the pressure in the system had reached approximately 6,000 psi (pounds per square inch). Coats left the area behind the stabbing board and walked over to

the area where the pressure gauge was located near the items being tested. Suddenly and unexpectedly, the bullplug blew out of the companion flange and the fluid under pressure erupted, striking Coats and knocking him down. As a result of the accident, Coats sustained a knee injury. He was sent to the United States for medical treatment, where he has remained.

Coats filed this action on April 10, 1989, asserting various maritime tort claims against Penrod for Penrod's alleged negligence, unseaworthiness of its vessel, and for maintenance and cure. Coats brings similar maritime tort claims against Defendant MIS/Hytorc, and also alleges certain contract claims against MIS/Hytorc based upon administration of certain health benefits and for retaliatory termination of such benefits. Coats also named as defendants Lee's Materials Services, Inc. ("Lee's"), which apparently acted as an agent for MIS/Hytorc in the United States, and PENROD NO. 69, which Coats sues *in rem*.

The defendants have previously moved to dismiss or for summary judgment, and Coats has also moved for summary judgment on various issues. These motions have been ruled upon by this Court, per Judge Daniel M. Russell, in several earlier orders. In a Memorandum Order issued April 25, 1990, Judge Russell denied the Motions to Dismiss of MIS/Hytorc and Lee's and granted Coats' Motion for Summary Judgment declaring that there is *in personam* jurisdiction over MIS/Hytorc and that this district is a convenient forum. In a second Memorandum Order, issued May 3, 1990, Judge Russell denied Coats' Motion for Summary Judgment for maintenance and cure and punitive damages and granted MIS/Hytorc's Motion for Summary Judgment dismissing Coats' claims under the Jones Act, 46 U.S.C. § 688. In a third Memorandum Order issued November 29, 1990, Judge Russell granted the Motion to Dismiss of MIS/Hytorc, dismissing Coats' claims under the Longshore and

---

1. The facts are set forth here only in summary detail. The facts relating to Coats' employment with MIS/Hytorc and relating to his injury have been elaborately set out in the numerous prior decisions rendered in this case by Judge Daniel M. Russell.

Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, but denied MIS/Hytorc's motion insofar as it sought dismissal of Coats' general maritime claims. In his third Memorandum Order, Judge Russell declined to address which substantive law should apply and directed the parties to brief that issue. Judge Russell also issued a fourth Memorandum Order on November 29, 1990, in which he denied Coats' Motion for Reconsideration of the Court's earlier denial of Coats' motion for summary judgment on Jones Act seaman status.

## II.

## CONCLUSIONS OF LAW

■ In ruling on a motion for summary judgment, the Court must afford the nonmoving party all favorable inferences from the pleadings, affidavits, and other material placed before the Court for consideration. *See Fine v. American Solar King Corp.*, 919 F.2d 290 (5th Cir.1990). The Court's objective in considering a summary judgment motion is to decide "whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 223 (5th Cir.1986) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Generally speaking, where the facts are conceded by the parties, the Court may utilize the summary judgment procedure to decide contested questions of law. Here, there are several questions of law to be decided.

### A. What Law Applies?

Penrod has filed a Motion for Summary Judgment, asking this Court to apply UAE law to the Complaint in this matter. MIS/Hytorc has also filed a Memorandum in Support of Application of Foreign Law. Coats responded with a Motion for Second Declaration that United States law applies. Thus, the choice of law inquiry into what law applies is placed squarely before the Court in this case.

Coats filed his original Complaint under the Jones Act, the LHWCA, the general maritime law, and the laws of Mississippi for damages arising out of his personal injury. This Court has previously ruled that Coats has no claim under either the Jones Act or the LHWCA. Although Coats has moved for summary judgment declaring that he has seaman status under the authority of *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) (i.e., *"Sieracki"* seaman status), for the purpose of deciding what law applies, the Court will assume momentarily that Coats' claims are brought under the general maritime law and Mississippi substantive law. Given the varied nature of Coats' claims, the Court cannot reach a singular decision that either the general maritime law, Mississippi law or UAE law applies to all of Coats' claims. The Court must make two choice of law decisions: (1) what law applies to Coats' common law tort and contract claims; and, (2) what law applies to Coats' general maritime claims.

### 1. CHOICE OF LAW UNDER MISSISSIPPI LAW

■ Under Mississippi law, the Court must apply a "center of gravity" or "most substantial contacts" approach to the question of what law applies. *See Mitchell v. Craft*, 211 So.2d 509 (Miss.1968); *Price v. Litton Systems, Inc.*, 784 F.2d 600 (5th Cir.1986). Mississippi derives its "center of gravity" approach from the factors set forth in the Restatement (Second) of Conflict of Laws. Section 145 of the Restatement provides the general rule in tort cases:

§ 145. The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, as to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Mitchell,* 211 So.2d at 515. The contacts identified in § 145 are to be weighed in accordance with the general principles set forth in § 6 of the Restatement:

§ 6. Choice of Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of applicable law rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Mitchell,* 211 So.2d at 516. There are also specific factors to be applied in contract cases, as set forth in § 188 of the Restatement, which include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the location of the subject matter of the contract, and,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Richardson v. Clayton & Lambert Mfg. Co.,* 634 F.Supp. 1480, 1482–1483 (N.D.Miss.1986). None of these factors is to be applied mechanically, nor is the choice of law analysis of the Court merely a matter of "counting contacts". *Id.* Initially, the Court must "identify those states having an interest in this litigation and then isolate those contacts that are relevant to the present inquiry." *Price, supra,* at 603.

At least five states have contacts with this litigation: (1) the State of Mississippi, from which Coats was recruited and to which he was returned after his injury; (2) the State of Louisiana, which contains the home port of the PENROD NO. 69; (3) the State of Delaware, where Penrod is incorporated; (4) the State of Texas, where Lee's is incorporated; and, (5) the UAE, where MIS/Hytorc is incorporated and has its principal place of business, and where Coats' injury occurred. Both Penrod and MIS/Hytorc argue strenuously for application of UAE law, since that is where the accident occurred and where Coats was domiciled at the time of his injury. MIS/Hytorc also points out that the Courts have addressed the choice of law question in tort cases in favor of application of the law of the place of injury, "absent a more significant relationship to another state." *Allison v. I.T.E. Imperial Corp.,* 928 F.2d 137 (5th Cir.1991). However, Coats' personal injury claim is, in the opinion of this Court, controlled by general maritime law. Under Mississippi law, the primary claim asserted by Coats is his wrongful discharge claim. The Court finds that Mississippi law applies to Coats' common law tort and contract claims for wrongful discharge.

It is clear that the place of contracting in this case is Mississippi. Coats and David Shelton negotiated Coats' employment contract in the State of Mississippi. Although the place of performance was to be in the UAE, Coats remained a Mississippi resident. This Court concludes that the most substantial contacts or the "center of gravity" for Coats' contract claims point to the application of Mississippi law. Therefore, with respect to Coats' common law tort and contract claims, including his claim for retaliatory termination of employment and of health benefits, the Court holds that Mississippi law should control. Although Mis-

sissippi law precludes any claim for wrongful discharge, as discussed below, the Court is convinced that Mississippi has the most significant contacts with Coats' common law claims for wrongful discharge and wrongful termination of health insurance benefits.

### 2. CHOICE OF LAW UNDER GENERAL MARITIME LAW

█ The Court must consider a different set of factor in its choice of law analysis under the general maritime law. In so doing, the Court concludes that United States law applies to Coats' claims under the general maritime law.

As the United States Supreme Court has directed, this Court must consider eight factors in determining whether federal maritime law or foreign law should govern a maritime tort. These eight factors, as recently reiterated by the Fifth Circuit, are:

(1) the place of the wrongful act;

(2) the law of the flag;

(3) the allegiance or domicile of the injured worker;

(4) the allegiance of the defendant shipowner;

(5) the place of the contract;

(6) the inaccessibility of the foreign forum;

(7) the law of the forum; and,

(8) the shipowner's base of operations.

*Fogleman v. Aramco (Arabian American Oil Co.)*, 920 F.2d 278, 282 (5th Cir.1991); *see also Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). It is important to understand that these factors are not applied in mechanical or routine fashion: "[T]he significance of each factor must be considered within the particular context of the [type of] claim and the national interest that might be served by the application of United States law.... Moreover, the significance of each factor in a nontraditional maritime context like offshore oil production may vary from that in the traditional shipping context...." *Id.* The Court considers each of the eight *Lauritzen–Rhoditis* factors separately below. The Court notes that the facts in each case

are different. It is these facts, as to each case, which the Court must consider in making a choice of law decision. The different factual setting is what distinguishes this case from *Fogleman*.

#### (1) The Place of the Wrongful Act

The place of the wrongful act in this instance was Ras Al Khaymah, one of the Emirates comprising the UAE. Generally, the place of the wrongful act has little bearing in a maritime context because, in the traditional maritime case involving a blue water vessel plying the seas, the location of the ship changes regularly. However, "[w]hen the injury stems from work on a permanently situated offshore oil rig or work platform ... the place of the wrong assumes greater importance." *Fogleman*, 920 F.2d at 282. Coats was injured while testing equipment aboard an oil rig which was dry-docked in the Port of Mina Saqr, Ras al Khaymah.

#### (2) The Law of the Flag

In maritime cases, the law of the flag has traditionally been a factor of central importance in determining what law applies. The United States Supreme Court stated that the law of the flag is "perhaps the most venerable and universal rule of maritime law" relative to what law applies in a given instance. *Lauritzen, supra*, 345 U.S. at 584, 73 S.Ct. at 929. The Supreme Court further indicated that "the weight given to the ensign overbears most other connecting events in determining applicable law." *Id.* at 585, 73 S.Ct. at 930. The PENROD NO. 69 carries a United States registry and its home port is New Orleans, Louisiana.

Nevertheless, both Penrod and MIS/Hytorc argue that the law of the flag should be given lesser weight in this circumstances because Coats worked on a number of vessels flying the flags of many different nations. The rationale usually offered for the law of the flag is that it assures uniformity in selection of the controlling law. That is, the registry of a vessel is easily ascertainable and the law of flag makes for a simple method for deciding what law to apply. Some courts have re-

treated from this strong emphasis on the law of the flag in nontraditional maritime cases such as offshore production cases. For example, in *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82 (9th Cir.1980), cited by both Penrod and MIS/Hytorc, the Ninth Circuit held that the law of the flag should be given lesser weight in non-traditional maritime situations:

> This rationale [the law of the flag] does not apply to a drilling vessel whose operations are at a fixed location. Here the locus is unchanging, and the logic of local experience can profitably be applied to the claims of these Trinidad nationals. That these workers were injured immediately offshore Trinidad is no fortuity, unlike the place of injury on a commercial sailing vessel.

*Id.* at 87. This Court is not convinced that the law of the flag, venerated and well established as it is in the maritime law of the United States, should be so quickly abandoned, particularly when other factors support the same result, as they do in this case.

(3) Allegiance or Domicile of the Injured

Both Penrod and MIS/Hytorc seek to characterize Coats as a UAE resident. However, Coats is a United States citizen, born in Mississippi, who has never at any time given up his U.S. citizenship or his Mississippi domicile. To the contrary, the record indicates that MIS/Hytorc promised to pay Coats for the cost of his transportation overseas to the UAE and back to his home in Mississippi on an annual basis and at the termination of his employment. The Court finds no basis for concluding that Coats actually or constructively abandoned his Mississippi domicile. Thus, Coats' allegiance to the United States and the State of Mississippi further supports application of United States law. Coats was in the UAE for only a few months, and only for the purpose of working for MIS/Hytorc. After his injury, Coats was flown back to Mississippi at MIS/Hytorc's expense.

(4) Allegiance of the Defendant Shipowner

The PENROD NO. 69 was unquestionably owned by a United States corporation, which owed its primary allegiance to the United States. The Court rejects any argument by Penrod to the contrary or any suggestion that Penrod's mere operation of a rig in the UAE and maintenance of a local office there somehow generated an obligation of allegiance to the UAE. It certainly does not appear that Penrod took that allegiance very seriously, insofar as it apparently had all of its profits channeled to Penrod's main office in Dallas, Texas, and all funding for PENROD NO. 69 had to be approved by Penrod's Dallas headquarters. Again, the allegiance of the shipowner, Penrod, points to application of United States law.

(5) Place of Contract

The Fifth Circuit recognized in *Fogleman* that the place of contract, which is generally a fortuitous occurrence for the traditional seaman, "becomes a substantial factor in nontraditional maritime employment aboard a vessel more or less permanently located off the costs of a particular country." *Id.* at 283. There is no contract between Coats and Penrod. The only contract in this instance is between Coats and MIS/Hytorc. That contract was originated when David Shelton met with Coats in Laurel, Mississippi. Although an Arabic-written contract was apparently executed in the UAE for the purpose of obtaining a work visa for Coats, it appears that the details of the contract had been agreed to in Mississippi.

(6) Inaccessibility of the Foreign Forum

The inaccessibility of the foreign forum is only relevant to a forum non conveniens determination. Since Judge Russell has already found that Mississippi is a proper forum for this action, the inaccessibility of UAE as a forum is irrelevant in this matter. However, the Court would note that all the parties have many more contacts with the United States than with the UAE and that it appears that the United States may be more accessible to all concerned.

(7) Law of the Forum

Penrod argues that neither the United States nor the State of Mississippi have any particularly compelling interest in

what law is applied to Coats' claims. MIS/Hytorc concedes that in *Lauritzen*, the Supreme Court held that the law of the forum is generally to be given little weight in determining choice of law issues. *Id.*, 345 U.S. at 590–592, 73 S.Ct. at 932–933. However, Coats brought his action in this Court and, as the Fifth Circuit has stated: "Whatever weight the law-of-the-forum factor has, therefore, tells on the side of the application of United States law." *Fogleman*, 920 F.2d at 283.

### (8) Base of Operations

MIS/Hytorc maintain that their base of operations was and is the UAE. However, the Court notes that MIS/Hytorc relied upon American nationals for a large percentage of its employees. More importantly, as Coats points out, MIS/Hytorc employed *no* UAE nationals at the time of Coats' injury. Although MIS/Hytorc was organized as a UAE corporation, it appears that the operations were controlled by Americans. Similarly, Penrod's base of operations at all relevant times appears to have been Dallas or Houston, Texas. Both Penrod and MIS/Hytorc appear to have maintained substantial and continuing contacts with the United States. This factor again points to application of United States law to Coats' general maritime claims.

The Court has reviewed all of the eight factors required by the *Lauritzen–Rhoditis* test. In the opinion of the Court, application of those factors and analysis of the facts in this case demonstrates that the only significant factor pointing to the application of UAE law is the place of the injury. This factor is, in the view of the Court, substantially outweighed by the counterweight of the additional factors set forth above. The United States has a compelling interest in assuring that its nationals, while working aboard U.S.-flagged vessels, are assured the benefits and the protections of United States law. Penrod stated the argument very plainly in its memorandum in opposition to MIS/Hytorc's motion for summary judgment:

The argument of Hytorc/MIS appears to be that because the Longshoreman and Harbor Workers Compensation Act does not apply to an injury such as that of Mr. Coats, that Hytorc/MIS, a group of Americans, can come to the United States, hire United States citizens, place them in jobs overseas where they are supervised by Americans and work for the benefit of Americans, and then injury, maim or kill such employees with impunity. Not only is this not right as a matter of ethics, it ignores the general maritime law.... Mr. Coats retains his General Maritime Law right to bring and action against his employer, Hytorc/MIS. Penrod retains its claim for indemnity or contribution.

*Plaintiff's Exhibit 2 to Motion for Second Declaration that United States Law Applies.* Penrod itself made an eloquent argument for application of general maritime law when seeking to support its indemnity claim against MIS/Hytorc. The Court finds that the argument made by Penrod, considered along with the various factors discussed above, supports application of United States law. Since the Defendants are also United States nationals (MIS/Hytorc is owned by United States nationals), no injustice is done to the Defendants by applying United States law. Accordingly, the Court holds that United States law will be applied to Coats' general maritime claim.[2]

### B. Does Coats Have a General Maritime Law Claim?

■ Having decided that the general maritime law of the United States law applies in this case, the Court now must look to the substance of that law to establish whether Coats has any claim under the general maritime law. Judge Russell has already determined that Coats is not a seaman under the Jones Act and that he is not entitled to any relief under the LHWCA. All that remains to be resolved is whether Coats is entitled to *Sieracki* seaman status. To the extent that Coats' moves for recon-

---

2. Since the Court has determined the United States law applies to the general maritime law claims in this action, the Court will grant Coats' motion to strike all foreign law issues from the Pre-trial Order.

sideration of Judge Russell's earlier decisions, Coats' motion is denied. This Court is not inclined to revisit Judge Russell's decisions on Coats' claims under the Jones Act or the LHWCA.

The concept of *Sieracki* seaman status originated in the case of *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). In that case, the United States Supreme Court held that a non-seaman stevedore, injured while loading cargo on a vessel, was entitled to the seaman's warranty of seaworthiness as a matter of policy, notwithstanding the absence of an employment relationship between him and the vessel owner. As the Supreme Court wrote:

> [As a matter of policy,] for injuries incurred while working onboard the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman, because he is doing seaman's work and incurring seaman's hazards.

*Id.* at 99, 66 S.Ct. at 879. The *Sieracki* doctrine was clarified in the subsequent case of *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), which involved an injury occurring when Hawn slipped and fell through an uncovered hatch hole on Pope & Talbot's vessel. Hawn sued Pope & Talbot, alleging unseaworthiness of the vessel. Rejecting the invitation to overrule *Sieracki*, the Supreme Court instead elaborated on the effect of the *Sieracki* ruling:

> Sieracki's legal protection was not based on the name "stevedore" but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness. The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. *His need for protection from unseaworthiness was neither more nor less than that of the stevedores* then working with him on the ship or of the seamen who had been or were

about to go on a voyage. All were subjected to the same danger. *All are entitled to like treatment under law.* (Emphasis added)

*Hawn*, 346 U.S. at 412–413, 74 S.Ct. at 207. Penrod concedes that the justification for the *Sieracki* seaman's remedy of unseaworthiness is to extend the traditional seaman's remedy of unseaworthiness to certain non-seaman who do work onboard a vessel traditionally done by seaman which requires them to be exposed to the same hazards seaman face. Penrod points out that in both *Sieracki* and *Pope & Talbot* the plaintiffs were injured while performing work which directly related to the loading of cargo aboard the vessel or to the repair of loading equipment.

The concept of *Sieracki* seaman status as a part of the general maritime law of the United States remained unchanged until Congress enacted amendments to the LHWCA in 1972. By and large, those amendments served to eliminate the availability of a *Sieracki* claim to workers covered under the LHWCA. In short, the 1972 amendments abrogated the *Sieracki* seaworthiness warranty owed to seaman and other workers covered under the LHWCA. *See Aparicio v. Swan Lake*, 643 F.2d 1109, 1116–1117 (5th Cir.1981).

However, there is some disagreement as to whether the 1972 amendments to the LHWCA also abolished *Sieracki* relief for seaman not covered by the LHWCA. *Compare Normile v. Maritime Co. of the Philipines*, 643 F.2d 1380 (9th Cir.1981) *with Aparicio v. Swan Lake, supra.* In *Aparicio*, the Fifth Circuit ruled that until Congress clearly abolishes *Sieracki* status for persons not covered by the LHWCA, the Fifth Circuit will continue to regard them as viable *Sieracki* seamen. In the subsequent case of *Cormier v. Oceanic Contractors, Inc.*, 696 F.2d 1112 (5th Cir. 1983), the Fifth Circuit reaffirmed that *Sieracki* seaman status is still available to employees who are not under the reach of the LHWCA because they are working in a foreign country. Under the Fifth Circuit rule, Coats comes squarely within one of these so-called "pockets of *Sieracki* sea-

man remaining after the 1972 amendments." *Aparicio,* 643 F.2d at 1118 n. 17. Therefore, Coats, as a *Sieracki* seaman, is entitled to proceed on his unseaworthiness claim under the general maritime law.[3]

Penrod argues that Coats is not entitled to *Sieracki* seaman status, even under the minority rule adopted by the Fifth Circuit, because he was not doing any traditional seaman's work at the time of his injury. Penrod contends that the testing work which Coats was performing was not related to any navigational aspect of the rig. Therefore, Penrod states, Coats was not doing traditional seaman's work such as loading or unloading the ship or making repairs to it, but rather he was doing what oilfield workers traditionally do on land or on vessels. In short, Penrod concludes, Coats' activities had nothing to do with traditional seafaring and he should not be afforded the status of a *Sieracki* seaman.

Penrod's argument overlooks the established law to the effect that "the warranty of seaworthiness may extend to shore based repair workers." *Rogers v. United States,* 452 F.2d 1149, 1151 (5th Cir.1972) (*citations omitted*). Of course, "[i]f the vessel is not in navigation, the owner owes no duty of seaworthiness to seamen or those enjoying Sieracki seaman status." *Hodges v. S.S. Tillie Lykes,* 512 F.2d 1279, 1280 (5th Cir.1975) (*citing Roper v. United States,* 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959)). In determining whether the vessel was in navigation, this Court must consider a number of status-oriented factors, which include: (a) the status of the ship; (b) the pattern of repairs; (c) the extensive nature of the work contracted to be done; and, (d) who has custody and control of the ship at the time of the alleged injury. *See Rogers v. United States, supra,* at 1151; *Delome v. Union Barge Line Company,* 444 F.2d 225, 231 (5th Cir.1971). As the Fifth Circuit made clear in *Delome,* "even a drydocked vessel may be subject to the warranty of seaworthiness if it is in naviga-

tion...." *Delome,* 444 F.2d at 231. Having considered the various status factors in this instance, the Court concludes that the PENROD NO. 69 appears to have been in navigation at the time of Coats' injury. The vessel was not in drydock for general repairs and most of the work being performed on the rig was not, technically, repairs but rather re-fitting with a side-drive. The work Coats was performing was not repair work. He was testing the equipment already in place on the rig. Additionally, the renovation and testing work the rig was undergoing were of a minor nature—when compared to the overall cost of the rig. The vessel never left the custody and control of its owner, Penrod. In fact, Penrod's own employees were working on the rig alongside Coats and other MIS/Hytorc employees. The rig was floating in forty (40) feet of water at the time and was within the ebb and flow of the tide. All of these factors point to the conclusion that the vessel remained in navigation even while it was in the Port of Mina Saqr. However, in the interest of developing a complete record, the Court will allow the jury to ultimately determine whether the vessel was in navigation, since "the navigational status of the vessel ordinarily remains a question of fact." *Id.* at 232. At this juncture, the Court is convinced that, therefore, Coats has stated a prima facie claim for unseaworthiness as a *Sieracki* seaman. Further, the Court rejects Penrod's argument that Coats was not engaged in any traditional maritime activity. The cases clearly illustrate that a shore-based worked is still entitled to the warranty of seaworthiness even when he is performing repairs on the vessel. *See Rogers, supra; Delome, supra.* The testing Coats was performing was such as could have been performed—and had been performed—by the crew of the PENROD NO. 69. Accordingly, Coats' motion for summary judgment on the issue of *Sieracki* seaman status will be granted.

Penrod further argues that Coats cannot recover because, as Penrod states: "A person retained to remedy a defective piece of

---

3. The Court would note that Coats also has a negligence claim as a *Sieracki* seaman. *See*

*Pope & Talbot,* 346 U.S. at 413–414, 74 S.Ct. at 207–208.

equipment, cannot claim against the customer for injury resulting from the very defect he was hired to detect and remedy." *Penrod Drilling Company's Opposition to Plaintiff's Motion for Summary Judgment.* This argument may be disposed of in short order. Coats was not, in the opinion of the Court, retained to *repair* the equipment in question, but rather to *test* the integrity of the equipment. Clearly, Coats was not engaged to complete any repairs to the equipment in the event that it failed. Additionally, even if it were the case that Coats' unseaworthiness claim is barred under this repairman theory advanced by Penrod, Coats would nevertheless have a negligence claim under the general maritime law. *Pope & Talbot, supra,* 346 U.S. at 413–414, 74 S.Ct. at 207–208. Coats has plainly alleged that Penrod negligently prepared the equipment which he was hired to test. Therefore, the Court will permit Coats' general maritime claim, as a *Sieracki* seaman, to proceed to trial. Naturally, this claim can only proceed against Penrod, the owner of the PENROD NO. 69, and not against MIS/Hytorc, which was neither the owner nor the operator of the PENROD NO. 69.

### C. Plaintiff's Motion to Strike Contributory Negligence Issues

■ Coats has filed a Motion to Strike Issues of Alleged Failure to Fill Lines with Hydraulic Fluid and Alleged Failure to Calibrate Pressure Gauge. In essence, this motion seeks to strike the issue of contributory negligence from this case. The Court is of the opinion that Coats was not, as he suggests, surprised or unfairly prejudiced by the alleged interjection of these issues into the case at the time the Pretrial Order was prepared. In its answer to Coats' original complaint, Penrod alleged that the accident resulting in Coats' injury was caused by Coats' failure to properly fill the lines with hydraulic fluid and that MIS/Hytorc personnel failed to properly calibrate the pressure gauge on the equipment Coats was using at the time of his accident. Therefore, the Court overrules Coats' motion to strike these issues from the Pretrial Order in this case.

### D. Lee's Material Services' Motion for Summary Judgment

■ Lee's has filed a Motion for Summary Judgment, seeking to be dismissed from this action on the ground that Coats has no viable claim for damages against Lee's. In his April 25, 1990 Memorandum Order, Judge Russell stated that "it would be best that the Court not rule upon LMS' motion to dismiss until discovery is completed in this cause. Accordingly, the motion of LMS to dismiss will be denied." Memo. Order at 14. The Court is of the opinion that Judge Russell did not intend by his earlier order to fully and finally rule that Lee's motion to dismiss was without merit. Rather, it is apparent from Judge Russell's order that he merely intended to defer a ruling on the viability of the claims asserted against Lee's until discovery was completed. Thus, the Court finds no merit in Coats' contention in the Pretrial Order that since Lee's motion to dismiss was denied, the present summary judgment motion should also be denied.

The record clearly reflects that Coats was hired by MIS/Hytorc and that Lee's had no involvement whatsoever with the initial contract of employment between Coats and MIS/Hytorc. Nor was any employee or agent of Lee's involved in the events which led to Coats' injury on April 12, 1988. Lee's only connection with this lawsuit is the fact that Lee's did transfer monies from MIS/Hytorc to Coats during the period from May 1988, to February 1989, by specific written order from MIS/Hytorc. In his Memorandum in Opposition to Lee's Motion for Summary Judgment, Coats indicates that he will not oppose Lee's motion, provided Lee's is dismissed at its own cost and that he is permitted to offered into evidence at trial the testimony of Mr. Robert Lee. Since Coats confesses the motion made by Lee's, the Court will grant Lee's motion for summary judgment. Furthermore, the Court will order that both parties bear their respective costs in this matter, insofar as Coats was required to incur considerable expense in order to conduct discovery regarding the

relationship between MIS/Hytorc and Lee's in this matter.

### E. MIS/Hytorc's Motion for Summary Judgment

■ MIS/Hytorc's present Motion for Summary Judgment seeks dismissal of Coats' claim for wrongful discharge or retaliatory discharge. This claim, of course, is a common law claim which sounds in both common law tort and contract. Coats alleges that his contract of employment for an indefinite term was terminated in response to his filing of this lawsuit.

MIS/Hytorc seeks dismissal of Coats' wrongful discharge claim based upon Mississippi's adherence to the "employment at will" doctrine. Mississippi continues to adhere to the rule that a contract of employment for an indefinite period of time may be terminated at the will of either party. *See Perry v. Sears, Roebuck & Co.*, 508 So.2d 1086 (Miss.1987); *Kelly v. Mississippi Valley Gas Co.*, 397 So.2d 874 (Miss. 1981). Although Coats seeks to bring his case within the limited exception recognized in *Laws v. Aetna Finance Co.*, 667 F.Supp. 342 (N.D.Miss.1987), the Court finds that the conduct of the MIS/Hytorc in this instance so closely resembles the factual situation in *Kelly, supra*, that *Kelly* controls. Coats does not come within the narrow exception to the employment at will doctrine recognized in *Laws*. Therefore, Coats' wrongful discharge or retaliatory discharge claim must be dismissed. However, the termination of Coats' employment does not, in the opinion of this Court, absolve MIS/Hytorc from liability for health insurance benefits for an injury which occurred *while Coats was still employed by MIS/Hytorc*. The parties will be ordered to further brief that issue for trial, especially with respect to the applicability, if any, of the COBRA statute to Coats' claim for continued health benefits. *See* 26 U.S.C. § 4980B(f). Therefore, the Court grants MIS/Hytorc's motion for summary judgment only with respect to Coats' wrongful discharge claim and will order the parties to further brief the question of Coats' continued entitlement to health benefits after the termination of his employment.

For the foregoing reasons, the Court concludes and orders as follows:

IT IS HEREBY ORDERED AND ADJUDGED that Mississippi law applies to Plaintiff Coats' common law claims, including his claim for retaliatory or wrongful discharge;

IT IS FURTHER ORDERED AND ADJUDGED that United States law applies to Coats' general maritime claim and that Coats' Motion for Summary Judgment on the issue of *Sieracki* seaman status is hereby granted;

IT IS FURTHER ORDERED AND ADJUDGED that Penrod Drilling Company's Motion for Summary Judgment seeking application of United Arab Emirates law to all claims is this action is denied, the Court finding that Mississippi law applies to Coats' common law tort and contract claims but that United States law applies to Coats' general maritime *Sieracki* seaman claim;

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's Motion to Strike All Defense Experts on the Issue of Foreign Law and to Strike All Foreign Law Issues is granted, insofar as the Court finds that United Arab Emirates law has no application in this case;

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiff's Motion to Strike Affidavit of Defense Counsel is now moot and that Plaintiff's Motion for a Second Declaration that United States Law Applies is granted with respect to Plaintiff's general maritime law claims in this action but is denied with respect to Plaintiff's common law tort and contract claims;

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's Motion to Strike Issues of Alleged Failure to Fill Lines with Hydraulic Fluid and Alleged Failure to Calibrate Pressure Gauge is hereby overruled;

IT IS FURTHER ORDERED AND ADJUDGED that the Motion for Summary Judgment of Defendant Lee's Materials Services, Inc. is granted and that Lee's Materials Services, Inc. is hereby dismissed with prejudice at its own cost;

IT IS FURTHER ORDERED AND AD-JUDGED that the Motion for Summary Judgment of Maritime Industrial Services, Inc. and Hytorc, M.E. is granted with respect to Plaintiff's wrongful discharge/retaliatory discharge claim;

IT IS FURTHER ORDERED AND AD-JUDGED that a separate judgment in favor of Lee's Materials Services, Inc. will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED AND AD-JUDGED that the parties submit additional authorities on the issue of Plaintiff's entitlement to health insurance benefits after the date of his termination of employment; the Court will rule on Defendants' Hytorc, M.E. and Maritime Industrial Services' motion for summary judgment on the issue of health insurance benefits upon review of these authorities provided by the parties.

SO ORDERED AND ADJUDGED.